IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.                              No. 18mj00074

GREGORY SCOTT STEPHEN,           TRANSCRIPT OF
                                    DETENTION HEARING

        Defendant.
_____/

        The Detention Hearing held before the Honorable Kelly K.E. Mahoney (appearing via VTC), Magistrate Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 111 Seventh Avenue Southeast, Cedar Rapids, Iowa, March 21, 2018, commencing at 12:59 p.m.

APPEARANCES

For the Plaintiff:      ANTHONY MORFITT, ESQ.
                       Assistant United States Attorney
                       111 Seventh Avenue Southeast
                       Cedar Rapids, IA 52401

For the Defendant:      MARK C. MEYER, ESQ.
                       Kinnamon, Kinnamon, Russo & Meyer
                       Suite 425
                       425 Second Street Southeast
                       Cedar Rapids, IA 52401

                       MARK R. BROWN, ESQ.
                       211 Third Avenue Southwest
                       Cedar Rapids, IA 52404

Also present:          Brian Draves, U.S. Probation

Reported via VTC by:    Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA 51101
                       (712) 233-3846

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR Document 24 Filed 04/05/18 Page 1 of 107

```
 1              THE COURT:  Thank you.  Please be seated.  We are here
 2    in the matter of the United States versus Greg -- is it Stephen
 3    or Stephen, sir?
 4              THE DEFENDANT:  It's Stephen.
 5              THE COURT:  Stephen, thank you -- Greg Stephen, Case
 6    Number 18mj74.  Would the parties please announce their
 7    appearances.
 8              MR. MORFITT:  Tony Morfitt on behalf of the United
 9    States.
10              MR. BROWN:  Attorney Mark Brown here for the
11    defendant.
12              MR. MEYER:  And also co-counsel Mark Meyer.
13              THE COURT:  Okay.  Thank you.  We are here on the
14    motion for pretrial release that was filed at document number 18
15    in this case.  I guess logistically there is a presumption.
16    It's my understanding from the motion that the defense has some
17    additional exhibits perhaps we may wish to offer?
18              MR. MEYER:  Yes, Your Honor.
19              THE COURT:  Okay.  Well, and I g -- let me back up,
20    too, I guess, too, just to make sure we're all on the same page.
21    The Court has received and reviewed the pretrial services report
22    that was filed at document number 12.  And, of course, I'm aware
23    the government -- or the defense has submitted some proposed
24    exhibits.  But just touch base first, have you had a chance as
25    the defense to review the pretrial services report that was
```

1    filed at document number 12?

2             MR. MEYER:  We have, Your Honor.

3             THE COURT:  Okay.  Mr. Morfitt, did you have that

4    opportunity as well?

5             MR. MORFITT:  Yes, Your Honor.

6             THE COURT:  Okay.  Mr. Brown or Mr. Meyer, do you wish

7    to offer any additional -- or any evidence?

8             MR. MEYER:  We do, Your Honor.  We would call

9    Dr. Rosell to testify.  I guess you can see him probably okay at

10   the witness stand?

11            THE COURT:  Yes.

12            MR. MEYER:  Okay.

13            THE COURT:  So --

14            MR. MEYER:  Dr. R -- if you could take the witness

15   stand.

16            THE COURT:  Raise your right hand.

17              LUIS ROSELL, DEFENDANT'S WITNESS, SWORN

18            THE COURT:  Please have a seat.

19            MR. MEYER:  Your Honor, may I approach the witness to

20   give him copies of the Defense Exhibits A and B?

21            THE COURT:  Yes, you may.  And just logistically, it

22   is fine with me if you stand or are seated to address the Court

23   or to question witnesses just as long as you're near a

24   microphone.  And also you can feel free to approach the witness

25   as you need.  You don't have to request permission first.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*

Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 3 of 107
To purchase a complete copy of the transcript.

1    MR. MEYER:  Your Honor, I think I'll just remain

2  seated then?

3    THE COURT:  That's fine.

4    DIRECT EXAMINATION

5  BY MR. MEYER:

6  Q.    Please state your name.

7  A.    Luis Rosell, L-u-i-s R-o-s-e-l-l.

8  Q.    Where are you -- where do you work?

9  A.    I'm in private practice as a forensic psychologist in Mount

10  Pleasant, Iowa.

11  Q.    And how long have you been doing that job?

12  A.    In -- next month it will be 16 years working in private

13  practice in Mount Pleasant.  I have a forensic practice, and I

14  do work throughout the midwest and many other states in the

15  country.  Prior to that I was the sex offender treatment

16  director for the Mount Pleasant Correctional Facility from '98

17  until 2002.

18  Q.    And do you have a copy of Exhibit B in front of you?

19  A.    Yes, that's a copy of my vita.

20  Q.    And I'm not going to ask you about every detail in your

21  résumé, but I do -- would like to confirm that you are on

22  several -- you're a certified boards; is that correct?

23  A.    Yes, I'm -- well, I'm licensed as a psychologist in

24  Illinois, Iowa, Missouri, and Washington state.  But I'm also --

25  in Illinois they require a certified sex offender evaluator

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 4 of 107
To purchase a complete copy of the transcript.

1  certificate.  So I'm -- I have that qualification also.

2  Q.   And do you have a similar qualification in Iowa with

3  respect to sex offender treatment?

4  A.   Yes.  That's from when I was the treatment director.  I

5  have not conducted treatment in several years since I've been in

6  private practice.  But that's what I had when I was working for

7  the Iowa Department of Corrections.

8  Q.   And when you were working for the Iowa Department of

9  Corrections, did you among your duties do risk assessments of

10  inmates?

11  A.   Yes.  I assisted the parole board in that, and I also was

12  involved with the director's review committee that determined

13  which individuals should be sent to the attorney general's

14  office for possible civil commitment under chapter 229A, state

15  of Iowa's civil commitment of sexually violent predators

16  statute.

17  Q.   All right.  And in your current capacity as psychological

18  consultant, do you do in part assessments of people who have

19  been charged with, for instance, child pornography possession?

20  A.   Yes, I've been conducting those evaluations for several

21  years now.

22  Q.   And if you had to put a figure on it, how many such

23  assessments do you think you would have conducted?

24  A.   Probably between 15 and 20.

25  Q.   You were -- consulted with Greg Stephen earlier this month,

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR Document 24 Filed 04/05/18 Page 5 of 107
To purchase a complete copy of the transcript

1   did you not?

2   A.   Correct.

3   Q.   And if you could take a look at Exhibit A in front of you,

4   is that a letter that you wrote recently in connection with that

5   consultation?

6   A.   Correct.  It was a letter I wrote to Attorney Mark Brown.

7   He wanted a summary of what -- just a brief summary of what

8   occurred during our evaluation, particularly related to this

9   hearing.

10  Q.   All right.  So you're aware that this hearing relates to

11  whether or not Greg Stephen should be detained pending further

12  proceedings in this matter?

13  A.   Correct.

14  Q.   And do you understand that one of the issues the judge will

15  have to decide is whether Greg poses a risk of harm to others

16  or -- in the community?

17  A.   Correct.

18  Q.   Or to himself?

19  A.   Correct.

20  Q.   And at the time that you met with Mr. Stephen, he hadn't

21  actually been charged with an offense yet?

22  A.   Correct.

23  Q.   So you didn't have perhaps full access to all the

24  information that you might have if you were to conduct an

25  evaluation at this point?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 6 of 107
*To purchase a complete copy of the transcript.*

1    A.    Correct.  I still haven't received all the different

2    charges that he -- I'm not really aware of everything he's been

3    charged with.

4    Q.    So just in general, though, is there -- well, let me back

5    up.  The pretrial services report recommends that Greg be

6    detained pending trial based on one factor, the nature of the

7    charge.  And the nature of the charge is possession of child

8    pornography.  Based on your training and experience, is there

9    anything about being a person in a class of individuals who's

10   been charged with child pornography that would automatically

11   make them a risk of harm to others?

12   A.    No.  Actually my experience in these cases -- and the

13   majority have been in Iowa; I've done a few in other states --

14   has been that the individuals after, let's say, their computers

15   were confiscated, many of them spent six months, a year -- one

16   case I had over two and a half years the individual was in the

17   community.  I met with him in the community before waiting

18   sentencing.  So my experience has been there's been a lot of

19   individuals with similar charges that have been allowed to

20   remain in the community.  So I found that this would be -- this

21   seems like it's being done a lot quicker than most cases.

22            With regard to risk, Mr. Stephen in my opinion does

23   not pose an additional risk at this time in terms of harm to

24   himself or to others given the fact -- lack of evidence that

25   he's harmed anyone already.

1        And in terms of a hands-on physical offense, a sexual

2  offense of a hands-on nature, there's no evidence of that.  He

3  has been found with the charges that we're aware of, but that

4  does not mean he's going to continue.  If anything, he's

5  probably most likely going to desist if he's in the community

6  for -- because he knows he's being watched.  And he already has

7  put himself in a difficult situation.  For him to continue that

8  behavior, I doubt -- I can't see that continuing.

9  Q.   And with respect to people that have actually been

10  convicted of a child pornography offense, what does your

11  experience and the literature indicate regarding whether those

12  people actually convicted of child pornography are likely to

13  recidivate?

14  A.   A great majority of the individuals who had been convicted,

15  served time, and then released, the great majority do not

16  continue engaging in that same behavior.  Therefore, that's one

17  of the reasons why I believe that he would not.  He doesn't have

18  any accs -- if he were in the community, I believe he would have

19  no access to computers or phones, et cetera, or limited access.

20  It's something that could easily be monitored.  So in this case

21  as well as what the research says, it's very -- very unlikely

22  that an individual will continue to engage in that behavior.

23  Q.   All right.  So in your professional opinion, imposing

24  conditions such as no access to computers or electronic devices

25  would be sufficient to ensure the safety of the community?

1    A.   That'd be one way, or if there was access that it be

2    monitored.

3    Q.   In conclusion then, do you stand by what you -- your

4    opinion in Exhibit A, that Mr. Stephen is safe to remain in the

5    community while awaiting adjudication for his current charges?

6    A.   Yes.  He has a strong support system.  He has roots in the

7    community.  He has employment.  Those are all positive things

8    that we usually want people in terms of having social support,

9    and so that's what makes him less likely to have any problem --

10   problems if he remained in the community.

11           MR. MEYER:  All right.  That's all the questions I

12   have, Your Honor.

13           THE COURT:  Cross-examination, Mr. Morfitt?

14           MR. MORFITT:  Yes, Your Honor.

15                      CROSS-EXAMINATION

16   BY MR. MORFITT:

17   Q.   Sir, and just so I don't mispronounce it over and over

18   again, how do you pronounce your last name?

19   A.   Rosell.

20   Q.   Rosell.  Thank you, sir.  Just touching briefly on

21   something that you mentioned on direct, it's your opinion that

22   individuals who have -- and if we refer to them only as child

23   pornography or child pornography-only offenses, that they're not

24   likely to recidivate.  Is that what you testified to?

25   A.   Yes, sir.

1  Q.   Okay.  What about hands-on offenders?  If there's

2  indication or evidence that someone's had hands-on sexual

3  contact with minors, are they more likely to recidivate than

4  people who are only child pornography-only offenders?

5  A.   Hands-on offenders -- well, it all depends on what type of

6  hands-on offenders.  There's a very broad range of different

7  types of offenses that can occur.  A lot --

8  Q.   I understand, sir, but my specific question is if you just

9  take the entire universe of hands-on offenders.

10 A.   They are more likely than a child pornography offender.

11 Q.   Thank you.  Now, I believe you met with the defendant in

12 this case, Mr. Stephen, on March 1 of this year?

13 A.   I did, sir.

14 Q.   And during that meeting you conducted a psychological

15 evaluation with him?

16 A.   Correct.

17 Q.   What goes into -- like what are the components of a

18 psychological evaluation?

19 A.   Well, I basically get a background history of his life, and

20 then I administer the Minnesota Multiphasic Personality

21 Inventory-Restructured Form on a computer.  So he answered those

22 questions.  And then I scored him based on the information --

23 well, I had limited information regarding -- to score him on

24 this one instrument related to child pornography because at that

25 time he had not even been charged, but he had told me that he

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 10 of 107

1  had some in possession, so he assumed he was going to be

2  charged.  And so -- and another instrument related to sexual

3  violence risk, and those were basically what the evaluation

4  consisted of.

5  Q.    Okay.

6  A.    Most of the time when I do the evaluations, there's a lot

7  more information.  It's more down the road.  This was --

8  Q.    Sure.

9  A.    -- done ahead of time.

10  Q.    And we'll talk about that in a little bit.  But for the

11  assessments, putting aside the MMPI for a moment, you did the

12  Child Pornography Offender Risk Tool?

13  A.    Correct.

14  Q.    And then you have listed Sexual Violence Risk-20.  Is that

15  a separate assessment?

16  A.    Yes.  It's basically a guided -- research-based clinical

17  judgment that looks at 20 factors that have been known to be

18  related to sexual offending behavior.  And so you look at the 20

19  items and see if any of the factors are present in the

20  individual.

21  Q.    So in this case when you met with him on March 1, how long

22  did it take for you to administer the MMPI?

23  A.    Well, the MMPI, I didn't time it.  Probably like 35 minutes

24  or so, 35, 40 minutes at the most.

25  Q.    Did you -- I believe with the MMPI there's some more like

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR  Document 29  Filed 04/05/18  Page 11 of 107

1  abbreviated versions versus full version you can give; correct?

2  A.   Well, this is the restructured form which is not as long as

3  the MMPI-2, but it's been validated in its own way.  So it's not

4  the abbreviated version.  It is shorter than the MMPI-2, but

5  it's its own test.

6  Q.   Okay.  And then how long did it take to do the Child

7  Pornography Offender Risk Tool?

8  A.   That's something that I can score basically in less than a

9  minute.  It's just seven items.

10 Q.   And how about for the Sexual Violence Risk-20?  How

11 long does --

12 A.   That does not take that long either.  There's 20 items.

13 The majority of the items aren't present with him because he

14 does not have --

15 Q.   Okay.  Sir, I didn't ask you that.

16 A.   Okay.

17 Q.   How long did it take for you to do that?

18 A.   Maybe five to ten minutes at the most.

19 Q.   And how long did you spend talking to the defendant to get

20 like his background, job history, that sort of thing?

21 A.   Probably an hour and a half or so.

22 Q.   So would it be fair for me to say that on March 1 you spent

23 approximately somewhere between two and two and a half hours

24 with the defendant?

25 A.   Something like that, yes, sir.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 12 of 107

1   Q.   Anything besides what we've just talked about that you did
2   with him during that two to two and a half hours?
3   A.   Not that I can recall, sir.
4   Q.   So you did not use a -- and I'm probably going to
5   mispronounce the second word here.  But you did not use a penile
6   plethysmograph.  You can correct me --
7   A.   Penile plethysmograph.
8   Q.   Yes.  You did not use one of those during your assessment.
9   A.   No.  I don't administer those.
10  Q.   And you did not do what is called an Abel Screen?
11  A.   No, I did not.
12  Q.   And an Abel Screen is where you have a person look at
13  different pictures of different aged people and see how long the
14  person focuses on each picture?
15  A.   Yes, sir.
16  Q.   And that's kind of to determine taking their consciousness,
17  if you will, out of it a little bit and see kind of how
18  subconsciously they react to various pictures?
19  A.   Yes, it's a measure of sexual interest, and the
20  plethysmograph is a measure of sexual arousal.
21  Q.   Okay.  And you didn't do the Abel Screen in this case even
22  though you knew he was there to see you about child pornography.
23  A.   Correct.  I'm not -- I'm not certified as an Abel Screen
24  administrator.
25  Q.   And you didn't do a Static-99 assessment?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 13 of 107

1  A.   No.  The Static-99R, you have to have been char -- he

2  hadn't been charged yet, and a lot of people -- usually you

3  don't score the Static-99 on individuals with child porn

4  charges.

5  Q.   Static-99 is more for hands-on contact-type offenses?

6  A.   Correct.

7  Q.   And so that's why in this case you used the CPORT

8  because -- for child pornography-only offenders?

9  A.   Correct.  The Static-99, knowing his history, I could score

10  it right now because it's just ten items, and he would --

11  because he has no history, he would probably score in the low

12  range but . . .

13  Q.   And, sir, since -- this is kind of a dumb question, but I'm

14  going to ask it just to make sure we're on the same page.  Since

15  you administered the MMPI-RF in this case, I assume you're

16  familiar with interpreting MMPI scores and the various scales?

17  A.   Yes.

18  Q.   In this case when you administered the MMPI-RF, did it

19  provide a valid profile for the defendant?

20  A.   Yes.  It said it was valid.  However, he was somewhat

21  defensive.  He was underreporting, presenting himself in a

22  favorable light without any deficiencies which is not uncommon

23  when I do forensic evaluations.  Many individuals are somewhat

24  defensive and stressed about their current situation.  So that's

25  what the interpretation indicated.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR Document 20 Filed 04/05/19 Page 14 of 107

1    Q.   And let's talk about it a little bit in detail.   I know --

2    I'm not as familiar with the RF.   How many validity scales are

3    there on the MMPI-RF?

4    A.   There are -- I think there's five total.   They are beyond

5    just the K, the L, and the F.   There are a few other ones.

6    Q.   For example, there's one called true response

7    inconsistency?

8    A.   Correct.

9    Q.   And is that -- when you looked at those five scales, that's

10   where it gave you the profile that he was being defensive and

11   underreporting?

12   A.   Correct.

13   Q.   And does -- the MMPI-RF, does it also include like an

14   antisocial behavior scale?

15   A.   Yes, it does.

16   Q.   Do you recall what the defendant's results were on that

17   scale?

18   A.   Every -- there was nothing in the clinical scales that

19   showed any significance.   So they were all below the level where

20   you would be -- that would be prominent, for example.   However,

21   you have -- because of the caution of the underreporting,

22   sometimes it's difficult to interpret.   But based on his

23   history, there isn't a lot of level of antisocial behavior.

24   Q.   What about the anger proneness scale?   Is that one of those

25   clinical scales you just mentioned?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 15 of 107

1  A.   Yes.  But I did not bring the whole -- I did not bring the

2  whole interpretation with me in terms of ans -- if -- I can't

3  answer exactly how he scored on each item.

4  Q.   And I'm not going to -- I don't intend to ask you because

5  that would put everybody here to sleep probably.

6  A.   Okay.

7  Q.   And you would agree that in some scenarios when you're

8  giving the MMPI-RF and looking at the validity scales,

9  particularly when you're looking in like a risk assessment for

10  release purposes like this, the test takers may, in fact, be

11  motivated to underreport some of their problems, psychological

12  issues, while they're meeting with you?

13  A.   Yes.

14  Q.   Now, moving away from the MMPI, during this -- I think you

15  said it was about an hour and a half or so that you'd spent just

16  kind of talking with the defendant, asking him background, that

17  kind of thing?

18  A.   Yes.

19  Q.   What -- just generally what topics would you cover with him

20  during that hour and a half?

21  A.   Just his upbringing, social history, sexual history,

22  employment history, substance abuse history, criminal history.

23  Q.   And I believe you've already said multiple times this

24  interview was before he'd actually been charged with a crime.

25  But at the time of the interview, were you aware that he -- his

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 16 of 107

1  homes had been searched by law enforcement and he had been

2  interviewed by law enforcement?

3  A.    Yes.

4  Q.    How were you aware of that?  Did he tell you?  Did somebody

5  else tell you?

6  A.    He told me, and I also read some of the -- what was

7  reported in the news which I know isn't always accurate.

8  Q.    Now, before you met with him, did you have any contact with

9  either Mr. Brown or Mr. Meyer?

10 A.    Yes.  Mr. Brown's the one who asked me to meet with him.

11 Q.    Why did Mr. Brown want you to meet with him?

12 A.    He wanted me to evaluate him to see where he was related to

13 his personality function, was there any -- if he had any

14 psychiatric problems, any specific areas that would be

15 concerning.

16 Q.    Okay.

17 A.    I've done numerous evaluations for Mr. Brown in the past on

18 a variety of cases, and that's usually what my evaluations have

19 been done.

20 Q.    And when you met with the defendant on March 1, what did

21 you tell the defendant about what the purpose of the meeting

22 was?

23 A.    Basically the same thing that Mr. Brown had told me, that I

24 was just trying to determine if he had any psychological

25 problems currently and to address these -- the charges and where

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

1  he was related his current mental status.

2  Q.   And did he know that -- scratch that.

3       When you first meet with the defendant on March 1 --

4  and maybe I get this from watching too many television shows --

5  but did you -- do you open the conversation at all with, "Tell

6  me why you think you're here today"?  Is that something you

7  would ask him or did ask him?

8  A.   No, I did not.

9  Q.   Now, when you were meeting with the defendant, did you ask

10 him if he actually possessed child pornography?

11      MR. MEYER:  Your Honor, I'll object to that.  Not sure

12 that it's relevant, and plus it I think goes into the

13 client-patient privilege as to what they specifically discussed.

14      THE COURT:  Mr. Morfitt, a response?

15      MR. MORFITT:  Yes, Your Honor.  This witness has

16 testified as to his expert opinion.  The government is allowed

17 to explore the basis for his opinion which includes what the

18 defendant told him.

19      In terms of the privilege, this is a defense witness

20 who is not -- who is not treating the defendant.  He was -- the

21 interview was not for the purpose of treatment, and he has been

22 called as a witness here, and any privilege has been waived.

23      THE COURT:  I will overrule the objection.  As I

24 understand it, the question called for a yes-or-no answer.  So,

25 Mr. Rosell, you can answer if you remember the question.  If

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 18 of 107

1  not, you can ask to have the question repeated.

2  A.   Yes, he did mention that.

3  Q.   And specifically he told you that he had in his possession

4  at one point child pornography.

5        MR. MEYER:  Your Honor, I'd renew the objection now

6  that we're beyond the yes-or-no part.

7        THE COURT:  I'll sustain the objection at this point.

8        MR. MORFITT:  Your Honor, a large part of my cross is

9  going to be what the defendant told this witness, so I maybe ask

10  that we take this up outside the hearing of the witness if the

11  Court wants to get into -- hear what my questions are going to

12  be.  But I believe any privilege has been waived and the

13  government should have the right to question this witness about

14  the reasons he came to his opinion.  Otherwise, his testimony

15  should be stricken.

16        THE COURT:  Okay.  I guess and, Mr. Meyer, what's your

17  response to this in regard to the privilege issue?

18        MR. MEYER:  Well, first of all, I didn't ask the

19  doctor specifically about any conversations that -- or anything

20  that Mr. Stephen talked to the witness about, so I don't think

21  the privilege has been waived.

22        And second, I think it's possible for the government

23  to examine the witness without getting into matters that relate

24  to the privilege.  And I do think that the privilege exists

25  because the conversation was between Dr. Rosell, a psycho --

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 19 of 107

1   psychologist, and Mr. Stephen, his patient at that point, for

2   purposes of getting an evaluation.

3           So I think that the privilege does remain and that the

4   state -- the government can continue to examine the witness

5   without getting into the specific details of what Mr. Stephen

6   said to Dr. Rosell.

7           THE COURT:  Why don't you go ahead and ask your next

8   question, Mr. Morfitt.  And then . . .

9           MR. MORFITT:  Sure.

10  BY MR. MORFITT:

11  Q.   When you were interviewing the defendant, did you ask him

12  about whether he had any covert recording devices in his

13  possession prior to the searches at his residence?

14          MR. MEYER:  Your Honor, this is along the same lines

15  again.  This doesn't have anything to do with whether as far as

16  I can tell -- maybe I'm missing the point but whether or not

17  Mr. Stephen is a risk of harm or likely to flee which is the

18  point of this hearing.

19          THE COURT:  Well, and I -- yes, go ahead.  I didn't

20  mean to cut you off.

21          MR. MEYER:  So I'd object on those grounds.  I'm

22  sorry, Your Honor.

23          THE COURT:  Sure.  Well, and I take the government's

24  point.  It was my understanding from the direct examination --

25  and I may have misunderstood -- that Mr. Rosell -- there had

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 34   Filed 04/05/18   Page 20 of 107

1 been no charges filed, and so he had limited information. I

2 understand the government's point that it's trying to determine

3 exactly, I guess, what type of information Mr. Rosell had which

4 goes to the weight that should be given to his opinion. And so

5 I understand that's what the government is trying to get at.

6 The real issue is whether or not this is a privileged

7 conversation. Obviously the defense has presented this witness

8 and has presented some of the information that came from this

9 consultation. But the real issue is whether or not what the

10 defendant said was privileged. I do think the government has a

11 right to inquire about the basis of the opinion.

12 I guess, Mr. Morfitt, what exactly -- where do you

13 intend to go with your questioning? I mean, obviously you're

14 asking questions about what the defendant specifically said.

15 MR. MORFITT: Yes, Your Honor. This witness has

16 testified that he spent approximately two to two and a half

17 hours with the defendant to form the opinion that he's testified

18 to and also wrote about in Exhibit A which does include some

19 information provided by Mr. Stephen to the witness.

20 Given that he then testified that an hour and a half

21 of this time that he spent with the defendant was during an

22 interview, it's clear that the large majority of the information

23 he considered in rendering his opinion is information provided

24 by the defendant. Therefore, in order to be able to adequately

25 test his opinion and the basis for it, the government should be

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR Document 24 Filed 04/05/18 Page 21 of 107

1    allowed to know what he was told.  Otherwise, we cannot

2    effectively cross-examine him and test the validity of his

3    opinion.

4            And again, with regard to the privilege, I would say

5    just by calling the witness the privilege has been waived if it

6    ever existed.  It's the government's position it did not exist

7    because this doctor's already testified the reason he evaluated

8    the defendant was not for medical purposes but for purposes of a

9    criminal case.  Then by calling him as a witness and putting in

10   Exhibit A as well as having him testify to his opinion, the

11   defense has waived any privilege that may exist about those

12   communications because those communications are reflected in

13   Exhibit A, were testified to by the defendant -- or by this

14   witness to an extent anyway and, again, are waived because those

15   statements are the basis of his opinion.

16           THE COURT:  Mr. Meyer, I tell you what.  I think the

17   government is correct.  And what I'm going to do at this point,

18   though, is I will give the defense the option.  Would you like

19   to have the defense proceed -- or the government proceed with

20   the cross-examination, or would you prefer to withdraw this

21   witness at this point, because, again, I think the government

22   has a right to inquire along this line.  But I don't think -- I

23   think the government can't fully cross-examine without getting

24   into these issues.  And I think it goes to the heart of what the

25   opinion is.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 22 of 107

1        MR. MEYER:  I appreciate you giving us the opportunity

2   to discuss this, Your Honor.  I would say that exactly what the

3   defendant said to Mr. Rosell doesn't -- isn't -- well, first of

4   all, wasn't the subject of direct examination, number one.  The

5   subject of the direct examination related to whether or not a

6   person being charged with a child pornography offense by -- in

7   and of itself indicates that a person is a risk of harm to a

8   community.  Then we went into whether or not if a person

9   convicted of such an offense would be likely to recidivate.

10  Then we talked generally about the fact that Mr. Rosell met with

11  the defendant, but we didn't discuss at any point exactly what

12  was said.  So we're being careful not to open this up, Your

13  Honor.

14        Second, I don't see that -- I think the government --

15  the basis for the detention hearing is the statement in the

16  pretrial services report that the nature of the charge itself

17  justifies detention.  And Dr. Rosell has testified that it

18  doesn't.  So I don't -- I think that all this other stuff goes

19  beyond what we testif -- what was inquired into on direct

20  examination and has nothing to do with the basis for the finding

21  in the pretrial services report that the charge itself justifies

22  detention.

23        So anyway, if the Court's position is that we

24  either -- how about if we do this?  Any -- any -- we withdraw

25  any -- we don't intend to rely on any evidence presented by the

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 1:18-mj-00074-LRR   Document 23   Filed 04/05/18   Page 23 of 107

1  doctor that is based on any particulars about criminal conduct

2  that the defendant might have mentioned to the doctor -- might

3  have stated to the doctor.  To the extent that the doctor's

4  opinion is based on that, we don't intend to rely on that at

5  all.  So we would withdraw -- I don't think we went into that.

6  But to the extent we did, we would withdraw any reliance on that

7  evidence.

8          THE COURT:  So you would be withdrawing his opinion

9  and any recommendation he made or testimony he's given that

10  would be based upon information he received from the defendant?

11         MR. MEYER:  Any information relating to criminal

12  conduct.  We could go so far as to withdraw any reliance on

13  anything that Mr. Stephen told the doctor, in other words, even

14  information about, you know, whether he's been convicted of a

15  crime, how long he's lived in the community, those sort of

16  things.  We don't need the doctor to present that evidence.

17         THE COURT:  Just one moment.  Well, I tell you what.

18  I -- at this point -- first of all, Defense Exhibits A and B

19  were referenced.  They haven't been offered.  I don't know if

20  you intend to offer those or not.  Essentially, though, the

21  privilege applies when it's a communication between a licensed

22  psychotherapist and the patient in the course of diagnosis for

23  treatment, and that privilege may be waived.

24         I understand the defense's argument that they

25  didn't -- they were trying not to open the door on things, but

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 24 of 107

```
 1   you're giving me an opinion that you want me to rely upon that's
 2   based upon information received from the defendant in large
 3   part.  So I think the government has a right to cross-examine in
 4   that regard.
 5          If the government isn't allowed to cross-examine as to
 6   what the basis of the opinion was fully, then the opinion
 7   will -- it's given -- it will be given limited weight.  So I
 8   don't know as that withdrawing any portion of it in relation to
 9   anything that's criminal works here.
10          I guess, Mr. Morfitt, I didn't give you a chance to
11   respond to what Mr. Meyer said.
12          MR. MORFITT:  Your Honor, and I'm not sure I'm
13   understanding the argument fully.  If the argument is we
14   withdraw Mr. Rosell's opinion that this particular defendant is
15   not a flight risk or a danger to the community but allow
16   Mr. Rosell to testify that people charged with child pornography
17   offenses are not flight risks or danger to the community, I'd
18   still object in that I believe even rendering that opinion
19   indicates that this witness thinks that that's all the defendant
20   did, and we should be allowed to test his basis for being able
21   to offer even that opinion.
22          So I don't believe unless the defense chooses to just
23   simply withdraw all of the evidence related to Mr. Rosell which
24   I'm not sure there's actually a rule for that, but if the Court
25   were to allow them to do that, the government would not have an
```

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 25 of 107

1  objection.  But if anything -- if the Court is going to consider

2  any evidence presented by this witness or either of the two

3  not-yet-moved-into-evidence exhibits, the government believes it

4  should have a full and fair opportunity to cross-examine.

5          THE COURT:  Okay.  I am going to overrule the

6  objection.  The government can go ahead and proceed with the

7  cross-examination.

8  BY MR. MORFITT:

9  Q.  Sir, during your conversation with the defendant, did he --

10  did the topic of covert recording devices in his house or hotel

11  rooms or anything like that ever come up?

12          MR. MEYER:  Your Honor, could I have one minute to

13  consult with -- sorry to delay things here more but if --

14          THE COURT:  No, that's fine.

15          MR. MEYER:  -- I may have a minute to consult with

16  counsel.

17          THE COURT:  And if need be, too, if we need to try to

18  consult with a sidebar, we can do so if need be.

19          MR. MEYER:  Okay.  Thank you, Judge.

20          We're -- you know, having lodged the objection and

21  it's overruled, we're ready to proceed, Your Honor.

22          THE COURT:  Okay.  Mr. Morfitt?

23  BY MR. MORFITT:

24  Q.  Sir, I think I've asked the question a couple times.  Do

25  you recall it?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 26 of 107

1  A.   Yes.

2  Q.   Okay.  What's the answer, please?

3  A.   Yes.

4  Q.   He did mention recording devices?

5  A.   Yes.

6  Q.   Did he indicate that he possessed various covert recording

7  devices?  And covert may be my word.

8  A.   I don't know about various, but he said he had engaged in

9  that behavior.

10  Q.   Okay.  That he had at least one recording device.

11  A.   Correct.

12  Q.   And did he admit to you that he recorded players from the

13  Iowa Barnstormers basketball team using that recording device?

14  A.   Yes.

15  Q.   Did he tell you where, like physical location, he had done

16  that?

17  A.   Other than hotel rooms.

18  Q.   He said hotel rooms?

19  A.   I think that's the only place, yes.

20  Q.   Nothing about doing it in his home in Monticello or in

21  Delhi?

22  A.   I don't know -- it was more about the hotel rooms.

23  Q.   Did he say where, like what state those hotel rooms were

24  in?

25  A.   I didn't ask.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2-1   Filed 04/05/18   Page 27 of 107

1  Q.   Did he tell you he'd watched the videos he made of the

2  Barnstormer players?

3  A.   I believe so, yes.

4  Q.   During your interview, did you ask him if he became -- if

5  he was sexually aroused by children?

6  A.   Define children.

7  Q.   Sure.  Let's start with prepubescent.

8  A.   I believe he denied any interest in prepubescent children.

9  Q.   How about like postpubescent to about 17 years of age?

10  A.   He said there was an interest there.

11  Q.   Sexual interest?

12  A.   Yes.

13  Q.   Did he specify which gender if either specifically?

14  A.   Male.

15  Q.   Did you ask him if he possessed any child pornography

16  beyond what he'd recorded on this recording device?

17  A.   No.  I didn't get into the details of the child

18  pornography.  As I said, he had not been charged with that.  But

19  he did tell me he had some.  He just didn't tell me -- I didn't

20  get into any details about that.

21  Q.   Okay.  So he said he had child pornography, but you didn't

22  ask him specifically where he got it, what kind it was, that

23  sort of thing.

24  A.   I can't recall if I did or not.

25  Q.   You can't recall if you asked him about --

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 28 of 107

1    A.    I can't recall what details he provided with that.

2    Q.    Did you make notes of your interview?

3    A.    Yes, I did.

4    Q.    Do you have those notes with you?

5    A.    They're not with me right now.

6    Q.    Did you bring a laptop computer with you today?

7    A.    They're in my laptop.

8    Q.    Would looking at those notes refresh your recollection as

9    to what he told you?

10   A.    Sure.

11          MR. MORFITT:  Your Honor, at this time I don't have

12   the laptop, but I'd ask for permission.

13          THE WITNESS:  It's over there, Your Honor.  It's back

14   there somewhere.

15          THE COURT:  Well, and, Mr. Morfitt, I had overruled

16   the objection.  I understand -- I guess the Court's concern is

17   that I found the privilege has been waived, but it seems that we

18   may be straying away perhaps from what the basis of the opinion

19   was and getting into the nitty-gritty of everything that was

20   said, and I don't want to spend the entire afternoon getting

21   into that because I think that it can be addressed more directly

22   with the basis of the opinion and what was and was not

23   considered.

24          MR. MORFITT:  Your Honor, that's part of my

25   questioning is I don't know what was and was not considered

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 29 of 107

1   given that all we have is a one-page letter.  There's no report.

2   There's no indications of what he actually considered in making

3   this opinion.

4           And so I believe knowing the details about what kind

5   of child pornography he was looking at is important to the

6   opinion, whether it was just these videos or if he was

7   downloading additional child pornography which could impact the

8   Court's decision about what kind of danger to the community he

9   represents.

10          THE COURT:  How about you ask the question then about

11  what it is he considered in making -- forming this opinion to

12  start with.

13          MR. MORFITT:  Sure.

14  BY MR. MORFITT:

15  Q.   Sir, what did you consider in determining the opinion that

16  you've rendered in Exhibit A that this defendant is not a danger

17  to the community?

18  A.   Based on my -- I'm aware of the covert videotaping.  I'm

19  aware of there's a possession of child pornography.  I'm aware

20  there has never been any alleged allegations regarding any

21  untoward behavior towards any person from a hands-on nature

22  because I'm sure if there was then I would have been made aware

23  of it.  Those are the facts that I considered when rendering my

24  opinion.

25          MR. MORFITT:  And, Your Honor, just to speed things

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov

Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 30 of 107
to purchase a complete copy of the transcript.

1   up, I'm near the end of my questions that I intend to ask, but I

2   do believe I should be able to explore the information provided

3   regarding child pornography.  And if reviewing his notes would

4   refresh the witness's recollection, we would ask to have the

5   ability to do so.

6           THE COURT:  I'm going to -- at this point I'm going to

7   deny that request and have the witness -- I mean, I think the

8   witness's indication was that he had inquiry but he didn't get

9   into the details is the response that I recall.  I guess why

10  don't you ask the question again.  I'm not sure I recall the

11  exact question.

12          MR. MORFITT:  Sure.

13  BY MR. MORFITT:

14  Q.   Sir, do you remember when the defendant indicated to you

15  that he possessed child pornography, did he indicate that the

16  only child pornography he possessed were the videos he'd made

17  with this recording device, or did he have additional child

18  pornography?

19  A.   I believe he had additional, but I did not ask him

20  regarding the subject matter.

21          MR. MORFITT:  Your Honor, the government's willing to

22  move on with that, and we won't ask him any more questions along

23  that line.

24          THE COURT:  Okay.

25  BY MR. MORFITT:

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 31 of 107

1  Q.   And, sir, just to verify, in rendering your opinion, you

2  had no information that he'd ever had hands-on contact with any

3  minors of a sexual nature.

4  A.   Correct.

5  Q.   Including no hands-on contact with any member of the Iowa

6  Barnstormers.

7  A.   Correct.

8  Q.   Sir, just in generally -- general, excuse me, when you're

9  rendering a psychological opinion or the types of opinions

10  you've rendered in this case, is it your practice to rely at

11  least in part on information provided by a patient?

12  A.   I -- that's the purpose of evaluating them, but also you

13  look at the objective information, for example, in this case or

14  any other case of this nature if an individual is found in

15  possession of --

16  Q.   Sir, I only asked you a pretty simple question.  Do you

17  rely at least in part on information provided by the patient?

18  A.   Yes.

19  Q.   And then you started talking about objective information.

20  So would you agree with me that the information provided by the

21  person you're evaluating is a subjective information versus

22  objective information you may get from other sources?

23  A.   It's subjective to some -- in some respects but can also be

24  objective.  I was thinking about in terms of if a person is

25  found in possession and then they deny they had anything to do

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 32 of 107

1  with it, that would be difficult to believe.

2  Q.   Sure.

3  A.   That's -- in that sense, so there would be subjective and

4  then obviously the objective data.

5  Q.   So would you agree with me that psychologists even after

6  performing evaluations can be mistaken?

7  A.   Everybody makes mistakes, not just psychologists.

8  Q.   And in this case you've been retained by the defendant to

9  provide these services?

10  A.   Correct.

11  Q.   So you're being paid by the defendant?

12  A.   Yes.

13  Q.   How much do you get paid?

14  A.   I've been paid for the evaluation and a subsequent report

15  which I haven't written yet $2,000.

16  Q.   And is that going to cover the subsequent report as well?

17  A.   I'm imagining it will.

18  Q.   And if you do any further work on the case, you might

19  receive some additional payment?

20  A.   That's possible.

21  Q.   And you've had communications with at least one of the

22  defendant's attorneys, Mr. Brown?

23  A.   Yes, I have.

24  Q.   You had that prior to the interview you conducted.

25  A.   Correct.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 33 of 107

1    Q.   Now, in your letter dated March 15 to Mr. Brown, you

2    indicate that it's your opinion that he will continue to engage

3    in law-abiding behavior, the "he" being the defendant; is that

4    correct?

5    A.   Yes.

6    Q.   Of course, he did admit to you to recording nude images of

7    minor boys; correct?

8    A.   He admitted engaging in unlawful behavior, yes.

9    Q.   And that's what I was going to ask.   Recording naked boys

10    under the age of 18 is not, in fact, law-abiding behavior;

11    correct?

12    A.   Correct.   I was implying that --

13    Q.   Sir, I didn't ask you any other questions.   And in this

14    letter dated March 15, you also indicated that in your opinion

15    he does not appear to be a flight risk; correct?

16    A.   Correct.

17    Q.   And you also indicated that he, I believe you said, is not

18    a danger to the community or not a danger to himself or others.

19    A.   Correct.

20    Q.   Now, these concepts, appearing to be a flight risk, danger

21    to the community, engaging in law-abiding behavior, would you

22    agree with me, sir, that those are legal concepts?

23    A.   I'm sorry.   You said legal?

24    Q.   Legal, yes.

25    A.   Yes, I assume so.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 34 of 107

1   Q.   For example, there's not like a diagnosis under the DSM of

2   not a flight risk.

3   A.   Yeah, correct.

4   Q.   Sir, during an evaluation just in general, I want to talk

5   about some of the things you would generally want to rely upon.

6   You already testified you want to interview the person you're

7   evaluating.

8   A.   Correct.

9   Q.   Want to spend a significant amount of time with that

10  person.

11  A.   Correct.

12  Q.   You want to be able to look through as many records as you

13  can lay your hands on.

14  A.   Yes.

15  Q.   And you want to look at the person's past like you'd

16  already mentioned, criminal history, psychiatric history, that

17  sort of thing?

18  A.   Correct.

19  Q.   Family situation?

20  A.   Correct.

21  Q.   Upbringing?

22  A.   Yes.

23  Q.   And specifically you've been retained in a number of

24  criminal cases over the last 14, 15 years?

25  A.   Yes.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 35 of 107

```
 1   Q.   And in criminal cases in particular you like to review --
 2   would you want to review, excuse me, when doing an evaluation
 3   things like interview reports?
 4   A.   Yes.
 5   Q.   Police reports?
 6   A.   Yes.
 7   Q.   Physical evidence if possible or pictures of evidence?
 8   A.   Yes.
 9   Q.   Grand jury transcripts if it's a federal case?
10   A.   Correct.
11   Q.   And in this case you've already said you didn't have access
12   to any of this information that we've just discussed beyond the
13   defendant's interview and the background he provided.
14   A.   Correct.
15   Q.   And so in this case there's now been filed a approximately
16   15-page criminal complaint affidavit.  At the time you did your
17   interview on March 1, you did not have that criminal complaint
18   affidavit; correct?
19   A.   True.
20   Q.   Have you reviewed that affidavit that I believe is dated
21   March 13 -- did you review that affidavit before you signed the
22   March 15 letter?
23   A.   No.
24   Q.   And have you reviewed that affidavit prior to your
25   testimony here today?
```

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 36 of 107

1  A.    No.

2  Q.    So at the time of your interview, you didn't know that he

3  was charged with not possession of child pornography but

4  transportation of child pornography?  Excuse me.  That -- he

5  hadn't been charged with anything, so let me rephrase the

6  question.

7        As you testify here today, until I just mentioned it,

8  were you aware that his charge was not possession of child

9  pornography but transportation of child pornography?

10 A.    I didn't know what he had been charged with.

11 Q.    And are you aware of the potential for other federal

12 charges given that this is only a criminal complaint?

13 A.    Yes.

14 Q.    Those other potential charges could include production of

15 child pornography, transportation of a minor to produce child

16 pornography, possession of child pornography, and other various

17 offenses?

18 A.    Correct.

19 Q.    So basically in this case before you rendered your opinion

20 you considered what the defendant had told you during the

21 interview and the results of the three tests you testified

22 about.

23 A.    Yes, but I was aware of the extent of all those -- what all

24 those charges are.  I was aware of the behaviors that led to

25 those charges so --

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 37 of 107

1   Q.   Based upon what he had told you about that behavior.

2   A.   Not just what he told me but Mr. Brown also told me.

3   Q.   I want to talk to you briefly about the Child Pornography

4   Offender Risk Tool that you used. So I don't have to keep

5   saying that mouthful of a name, can I call it CPORT so we're

6   both on the page with what we're talking about?

7   A.   That's what it's called.

8   Q.   That's a relatively new tool, isn't it?

9   A.   Correct.

10   Q.   About how old is it?

11   A.   It was published in 2015.

12   Q.   And now we'd also mentioned earlier the Static-99. That

13   test has been around significantly longer than CPORT?

14   A.   Since 1999.

15   Q.   And so the Static-99 -- or am I saying that right,

16   Static-99?

17   A.   It's now the 99R. It was revised in 2009.

18   Q.   That particular test, the 99, has been through a fair

19   amount of peer review, empirical studies, and the like?

20   A.   Numerous.

21   Q.   CPORT, however, has not.

22   A.   They've had one subsequent validation study.

23   Q.   And is my understanding correct that some of the factors

24   considered in CPORT were cribbed, if you will, or similar to the

25   factors that are used in Static-99?

1   A.   Only a few of them.

2   Q.   Now, just in general, not talking about this defendant

3   specifically, when you deal with offenders who have child

4   pornography, it's a relatively small percentage of offenders

5   with child pornography that mainly possess images of boys.  Is

6   that an accurate statement?

7   A.   I don't know what the breakdown is in terms of a smaller

8   percentage.  I don't know what the breakdown is.

9   Q.   Are you aware of a -- looks like maybe a study from Seto

10  and Eke, S-e-t-o and E-k-e?

11  A.   Yeah, Seto and Eke.

12  Q.   Are they, in fact -- I don't know if they wrote the CPORT,

13  but are they at least involved in the creation of CPORT?

14  A.   They are the developers of it.

15  Q.   And if they reported that 9 percent of offenders possessed

16  mainly images of boys, does that sound about right?

17  A.   Correct.

18  Q.   One of the CPORT risk factors is age of the offender?

19  A.   Yes, it is.

20  Q.   I believe the breakdown is at 35?

21  A.   Yes.  You receive a point if you're under 35 and 0 if

22  you're over 35.

23  Q.   And is that when -- the cutoff, when you determine if

24  somebody's 35 and going to get that point, is that when they

25  commence the offense or the time you do the interview?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 39 of 107

1   A.   I think it's their current age.

2   Q.   Okay.  But fair to say if you were evaluating someone who

3   was under 35, CPORT indicates that they're more at risk to

4   reoffend.

5   A.   It's like with any criminal behavior, the younger you are.

6   Q.   And then another one of the risk factors is any prior or

7   index contact sexual offending.  Does that sound about right?

8   A.   That's, yeah, the third item.

9   Q.   Okay.  Can you just describe for the Court what that means

10  because that's kind of psychologist speak?

11  A.   Have you ever been con -- well, it's sexual offense.  I

12  think it's conviction but if you have a prior conviction of a

13  hands-on offense.

14  Q.   Is it conviction only, or is it if you've committed prior

15  hands-on offense, even if you've never been convicted of it?

16  A.   I think it's conviction, but I'm not totally sure.

17  Q.   But fair to say that both CPORT and Static-99 are -- both

18  kind of indicate that any prior contact offenses are a

19  significant predictor for future risk?

20  A.   Correct.

21  Q.   And if you have a combination of contact offenses and child

22  pornography offenses, is that an offender who's more likely to

23  be a pedophile or to have future risk?

24  A.   Well, pedophile's a whole other issue.

25  Q.   And --

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR  Document 2  Filed 04/05/18  Page 40 of 107
*to purchase a complete copy of the transcript.*

1   A.   That's a diagnosis.

2   Q.   Yeah, and we'll get to that in a second.  Let me ask the

3   question differently.

4            MR. MEYER:  Your Honor, I'd like to have the witness

5   have an opportunity to answer fully the question.

6            THE COURT:  Yeah, you can go ahead and answer in

7   completion, sir.

8   A.   I'm trying to remember where I was.

9   Q.   Let me repeat the question and make it a little clearer so

10  I don't pull in a different topic.

11  A.   You asked about if a person who's committed a hands-on

12  offense and also possesses child porn, are they a higher risk.

13  Q.   Yes.

14  A.   According to this instrument, yes, they get points for

15  that.

16  Q.   Thank you.  And that having a sexual interest in children

17  is an established risk factor for sexual recidivism; that a

18  correct statement?

19  A.   You're talking about number 5, like item 5, indication of

20  pedophilic sex interest?

21  Q.   No, I'm not actually quite there yet.

22  A.   Oh.

23  Q.   Are you familiar with a study from Hanson and

24  Morton-Bourgon from 2005?

25  A.   Yeah, the meta-analysis.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 41 of 107

1  Q.   And would it be an accurate statement to say that that

2  concluded that having a sexual interest in children is an

3  established risk factor for sexual recidivism with contact

4  offenders?

5  A.   Yes.  It's the -- it's moderate predictive -- it's one of

6  the stronger of factors.  It's still not very strong, but it's

7  the strongest of all the factors they looked at in the

8  meta-analysis.  If you have deviant sexual interest as measured

9  by the penile plethysmograph to prepubescent children, you are

10 more likely to recidivate.

11 Q.   And then one more question.  Are you familiar with a study

12 from Bourke which is B-o-u-r-k-e, et al., from 2014?

13 A.   The Butner study?

14 Q.   Yeah, if that's how you pronounce it.

15 A.   Yeah, I'm familiar with it.

16 Q.   Did that research from that study indicate that a little

17 over half of what were classified as child pornography offenders

18 with no known contact history admitted to actually having

19 committed a prior sex -- contact sex offense against a child?

20 A.   Yes, that's considered the outlier in the field according

21 to Michael Seto who's done a -- research on all that, but yeah.

22 Q.   Yes, sir.  That's good.  I only asked you one question.

23 A.   Yeah, yeah, I'm familiar with it.

24 Q.   And then moving to factor 6 from CPORT, what I'm looking at

25 indicates that having over 51 -- 51 percent or more boy content

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 22   Filed 04/05/19   Page 42 of 107

1  in child pornography is a risk factor; correct?

2  A.   Correct.

3  Q.   And that possessing a sexual interest in boys correlates to

4  a persistence in contact sex offending against boys.  Is that a

5  correct statement?

6  A.   That's -- you're talking about from the CPORT or just

7  research?

8  Q.   Just in general.

9  A.   In general, yes.

10 Q.   And that some offenders who have interest in boys also

11 often display what could be called like a higher congruence with

12 children?  Would that be a fair statement?

13 A.   I don't know -- you're talking about emotional congruence

14 with children?

15 Q.   Yes.

16 A.   Which is one of the dynamic risk factors found with sex

17 offenders.  I don't know if it's specific to boys.  I mean,

18 there are adults who are also interested in girls.

19 Q.   Who have a similar --

20 A.   Yes, so I don't know the breakdown there.

21 Q.   Okay.  So fair to say with -- let's just talk with

22 children, that if they have a sexual interest in children, they

23 often may display a higher congruence with children emotionally

24 and intimately?

25 A.   There are some individuals like that, correct.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24-4   Filed 04/05/19   Page 43 of 107

1 Q. And that some people like that sometimes have to meet their

2 emotional intimacy needs through contact with children rather

3 than adults.

4 A. That has occurred.

5 Q. And, sir, this -- in CPORT, the factor number 7 confused me

6 a little when I was looking at it. It again refers to boy

7 content being more than girl content. But is it also discussing

8 non-nude images of boys?

9 A. Correct.

10 Q. So if like somebody possesses, say, TV -- or maybe not TV

11 but like newspaper advertisements involving young boys not nude

12 more than of girls, that is a risk factor?

13 A. Yeah, that's -- what you just described would be number 6.

14 Number 7 is more about the nudity.

15 Q. Okay. And I may have had them in a different order --

16 A. That's fine.

17 Q. -- here from what I was looking at. And, sir, would it be

18 fair to say at this point CPORT is not -- and this is probably

19 psychological-specific speak. But CPORT is not a standard

20 actuarial in the treatment of sex offenders?

21 A. Well, first of all, it has nothing to do with treatment in

22 the assessment of sex offenders. It's new. It's more of a

23 research tool. It's better than what we had five years ago.

24 And so that's why it should be used with caution.

25          One of the issues is because the low base rate of

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR Document 24 Filed 04/05/18 Page 44 of 107

1  recidivism is hard to distinguish someone scoring a 2 -- for

2  example, if someone scores low or someone scores moderate or

3  high, there isn't that much of a distinction because the base

4  rate is very low overall unlike other instruments.  So -- but it

5  just gives you some idea of what factors to look at and consider

6  with regard to recidivism.

7  Q.   And so would it be fair to say that CPORT doesn't yet

8  produce a predictive value among child pornography offenders to

9  become contact offenders?

10  A.   Well, the fact is that the majority of them based on the

11  research do not -- are not contact offenders.  That's why it's

12  not that probative because of the low base rate.

13  Q.   Yes, sir.  And I think you answered my question, but I'm

14  trying to get to a more -- so my lawyerly brain can understand

15  it.  Basically at this point because of the low base rate CPORT

16  doesn't produce a good scientifically value -- validated

17  predictive value of a child pornography offender becoming a

18  contact offender.

19  A.   Correct.

20  Q.   And so at this point CPORT -- it demonstrates an initial

21  benefit in determining the risk assessment of child

22  pornography-only offenders.

23  A.   Yes, sir.

24  Q.   Sir, as a psychologist, have you ever been lied to?

25  A.   Even as a regular layperson I've been lied to, yes.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 45 of 107

1   Q.   But how about in your professional context?  Have you --

2   A.   I'm sure I have.

3   Q.   How often have you testified in criminal court over the

4   last 14, 15 years?

5   A.   Second time this week.  290 or so times since 2002.

6   Q.   And out of those 290, how many times have you been retained

7   by a defendant?

8   A.   The times I've testified for the government in federal

9   cases has been, I think, three times in federal court in

10  Massachusetts, federal court in North Carolina, and federal

11  court in Des Moines on a variety of cases.  Some were sexual

12  offenders.  Some were just competency.  And then I've testified

13  in Chicago in state court for the state attorney general and --

14  but the majority of the time has been for defendants.

15  Q.   Would you say the vast majority of the time?

16  A.   Well, I just gave you the four or five exceptions, so yes.

17  Q.   I wasn't sure if you'd testified multiple times in Illinois

18  or not.

19  A.   I have but not for the state, no.

20  Q.   What percentage of your income currently is derived from

21  clinical work versus forensic work?

22  A.   It's all clinical -- it's all forensic right now.

23  Q.   You're not doing any clinical hours at this point?

24  A.   No.  I live in a small town.  There's not a -- I don't have

25  time to -- I'm just really busy, so I don't have a clinical

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 26   Filed 04/05/18   Page 46 of 107

1  practice.

2  Q.   How ever long you work -- many hours I'm sure -- 100

3  percent of that is dedicated to forensic work.

4  A.   Correct.

5  Q.   We briefly touched on it because I brought it up

6  incorrectly, but there is actually a DSM diagnosis for

7  pedophilia; is that correct?

8  A.   Correct.

9  Q.   Now, in this case have you diagnosed the defendant with

10 anything?

11 A.   No, I have not.

12 Q.   Is that something you may do as you work on your final

13 report or analysis?

14 A.   Possibly.  Based on -- I would have to see -- I'd have to

15 have more information.  Like I said, I don't have the child

16 pornography -- I don't know what -- specifically what's all

17 there, not that you can always diagnose by that, but if the

18 interest is not in prepubescents, then he would not meet the

19 criteria for pedophilic disorder which is the diagnosis of an

20 attraction to prepubescent children.

21 Q.   And my question was probably bad.  I'm not asking just

22 specifically about pedophilia.  But would it be fair to say at

23 this point you don't have enough information to diagnose him

24 with anything out of the DSM?

25 A.   Correct.  Based on the lack of psychiatric history, of

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 47 of 107

1    depression, anxiety, et cetera, not everybody is diagnosable.

2    Q.    And fair to say someone who's been charged in federal court

3    looking at potential jail time may be depressed anyway.

4    A.    And experiencing stress, yes.

5    Q.    You mentioned pedophilia, and I know it's not in the DSM.

6    But are you familiar with the term -- and I'm going to

7    mispronounce it, I'm sure -- hebephilia?

8    A.    I'm familiar with it, yes, sir.

9    Q.    And what -- and I believe that's fairly controversial about

10   whether that should be a diagnosis that's included in the DSM;

11   is that correct?

12   A.    Correct.  It's very controversial, and it's not included in

13   the DSM.

14   Q.    What is just in general the concept of hebephilia?

15   A.    Sexual attraction to pubescent or postpubescent adolescents

16   usually between 13, 14, 15 years old.

17   Q.    I think the controversy comes because some people take the

18   position that historically human beings used to mate when they

19   were postpubescent; is that correct?

20   A.    Very much so.  That's one of the arguments I always make,

21   so I like how you put it.

22   Q.    But fair to say that regardless of what historically may

23   exist -- and this doesn't indicate about whether it should be in

24   the DSM -- it is currently illegal for adults to have sexual

25   contact with people under the age of 18 depending on what state

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 26   Filed 04/05/19   Page 48 of 107

1   you're in.

2   A.   Yes, that's correct.

3   Q.   Now, sir, if you found out that at any point the defendant

4   had touched somebody who was under the age of 18 in a sexual

5   manner, would that change your opinion that you've rendered in

6   this case at all?

7   A.   Regarding what specifically?   Whether he's safe to be in

8   the community?

9   Q.   Flight risk, danger to the community, that sort of thing.

10   A.   If that were the case, then it possibly would, yes.

11   Q.   What if you found out that he was laying in bed with

12   somebody under the age of 18 and was masturbating while laying

13   next to this minor?   Would that change your opinion at all?

14   A.   Possibly.

15   Q.   And, sir, this March 15 letter, did you draft that letter?

16   A.   Yes, I did.

17   Q.   Did Mr. Brown tell you what he wanted to be in that letter?

18   A.   Not that I can recall.   He just wanted me to have a summary

19   of what I might be addressing today.

20   Q.   And, sir, the reason I ask is because you use terms like

21   flight risk that are kind of legal concepts.   Are you familiar

22   with those terms given your extensive experience testifying in

23   court?

24   A.   I'm well aware of the concept, but I think Mr. Brown asked

25   me if I felt that he could be safe to be re -- remain in the

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 20   Filed 04/05/18   Page 49 of 107

1  community until his sentencing hearing.

2          MR. MORFITT:  Nothing further, Your Honor.

3          THE COURT:  Redirect, Mr. Meyer, Mr. Brown?

4          MR. MEYER:  Your Honor, I'd move to introduce Exhibits

5  A and B at this point having failed to do so originally.

6                          *   *   *   *

7          (Exhibits A and B were offered.)

8                          *   *   *   *

9          THE COURT:  Okay.  Is there any objection to that,

10 Mr. Morfitt?

11         MR. MORFITT:  No, Your Honor.

12         THE COURT:  Okay.  Gov -- or the Defense Exhibits A

13 and B are received.

14                         *   *   *   *

15         (Exhibits A and B were admitted.)

16                         *   *   *   *

17         THE COURT:  And I believe that there was prior --

18 previously a motion regarding Exhibit A that it be filed under

19 seal.  Is that -- is that correct, Mr. Meyer?

20         MR. MEYER:  Yes.  I would --

21         THE COURT:  Okay.

22         MR. MEYER:  I think I was actually granted leave to

23 file that under seal.

24         THE COURT:  Yes, it is filed und -- it shall be filed

25 under seal as it is.  Okay.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR  Document 26  Filed 04/05/18  Page 50 of 107

1          MR. MEYER:  All right.

2                    REDIRECT EXAMINATION

3   BY MR. MEYER:

4   Q.   And then bottom line, is it your opinion that -- well, let

5   me ask you this.  What does it mean, a low baseline for

6   recidivism for persons convicted of -- convicted of child

7   pornography offense?

8   A.   Well, it's low base rate.  The majority of the individuals

9   that they researched who had a conviction of child pornography

10  when released in the community, the great majority did not

11  continue to engage in the same behavior.  And because when that

12  occurs then it makes it more difficult to discriminate between

13  those who are more dangerous or less dangerous because the

14  majority of them don't.

15          It's like, for example, female sex offenders.  We

16  don't have a female sex offender actuarial because their base

17  rate is so low of reoffending that there's -- you're not going

18  to be able to discriminate.  So it's basically based on

19  statistics.

20  Q.   So the risk of any offender recidivating, child pornography

21  offender, is so low that it's hard to distinguish between

22  offenders with different characteristics.  They're low for all

23  across the board.

24  A.   Pretty much, correct.

25  Q.   And there was some discussion about hands-on offenders.

1 What do you -- when somebody says hands-on offender, what are

2 you thinking?

3 A.   Well, it's not just what I'm thinking; it's how it's

4 defined:  If someone has actually touched an individual.  So if

5 someone exposes themselves, peeps in windows, possesses child

6 pornography, they're considered noncontact offender.  If you

7 engage in a hands-on offending, touching a child over clothing

8 in a genital area, that would be considered a hands-on offense.

9 Q.   In a genital area; right?

10 A.   Yes.  I mean, if you touch a child on the shoulder, that's

11 not going to be a contact offense.  But a -- if you engage --

12 touch a child inappropriately in a sexual manner above or below

13 clothing, that would be considered a contact offense because

14 you're doing it for the purposes of your own sexual arousal.

15 Q.   You were asked about the Butner study and didn't get a

16 chance to talk about it in detail.

17 A.   Yeah, the Butner study was from the Federal Correctional

18 Institution in Butner, North Carolina, where they had a sex

19 offender treatment program, and individuals were all forced to

20 polygraph, and many of them admitted to -- admitted more than

21 they had actually offended to.  It's very controversial, and

22 there's been a lot of problems with it.

23          But the results -- the first one came out in 2001, and

24 compared to everybody else's sample, they basically said 85

25 percent of individuals had -- who had possessed child

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 52 of 107

 1   pornography had also had -- touched a child.  And that went

 2   against all the other research that was out there.  So that's

 3   why it's considered an outlier.  So that's some of the problems

 4   the Butner -- there's a list of other issues the Butner study

 5   has had.  But that's all I wanted to say.

 6   Q.   And so do you put much credence in the Butner study

 7   personally?

 8   A.   No.  I look at all the studies put together, and then you

 9   try to find the ones -- the -- you know, every study might have

10   its outliers, so you want to see what the average study found.

11   And that's the kind of -- the work that Dr. Seto has done.

12   Q.   And after being examined by the prosecutor, is it still

13   your opinion that if released Mr. Stephen could engage in

14   law-abiding behavior?

15   A.   Yes.  Other than these behaviors that he's engaged in,

16   there's been no other -- he's always been very compliant in

17   terms of not getting in any other kind of trouble.  As we all

18   know, evaluating other individuals or you guys defending or

19   prosecuting, there's a lot of individuals who can't follow any

20   rules, are constantly in trouble.  That's not Mr. Stephen.

21           MR. MEYER:  That's all the questions I have, Your

22   Honor.

23           THE COURT:  Any recross based on that, Mr. Morfitt?

24           MR. MORFITT:  No, Your Honor.

25           THE COURT:  Okay.  Thank you, Mr. Rosell.  You can

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 53 of 107

1  step down.

2       THE WITNESS:  Thank you, Your Honor.

3       THE COURT:  And with that, does the defense have any

4  other evidence it would like to offer?

5       MR. BROWN:  Judge, this is Mark Brown, and I'd like to

6  please on the defendant's behalf briefly call his father, Roger

7  Stephen, please.

8       THE COURT:  Okay.  Mr. Stephen, if you want to come

9  forward to the witness stand, counsel can direct you where to

10  go.

11      MR. BROWN:  Thank you, Judge.

12      THE COURT:  And if you want to come -- you can go

13  ahead and go up around the stand there.  And, sir, could you

14  please just -- you can have a seat if you want or if you want --

15  you can remain seated if you want to raise your right hand,

16  please.

17          ROGER STEPHEN, DEFENDANT'S WITNESS, SWORN

18      THE COURT:  Please have a seat, sir.

19                    DIRECT EXAMINATION

20  BY MR. BROWN:

21  Q.   Would you state your full name, please.

22  A.   My name is Roger William Stephen.

23  Q.   And, sir, where do you live or reside, please?

24  A.   I live at 252 151, Highway 151, in Monticello, Iowa.

25  Q.   Just briefly, sir, how long have you been in the

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 54 of 107
*to purchase a complete copy of the transcript.*

1    Monticello, Iowa, area, please?

2    A.    Right at 50 years.

3    Q.    All right.  And could I ask you before moving to

4    Monticello, the area there, where did you grow up or live,

5    please?

6    A.    Here in Cedar Rapids.

7    Q.    All right.  So it'd be fair to say that your life

8    basically, you've lived either in Cedar Rapids or 20, 30 miles

9    away from here in Monticello; is that true?

10   A.    It was all but about eight years.

11   Q.    All right.  So could I ask you, please, again, briefly are

12   you married?

13   A.    Yes.

14   Q.    All right.  And you live with your wife obviously in

15   Monticello; true?

16   A.    Yes.

17   Q.    And obviously Mr. Meyer and I, our client here, Greg, is

18   your son; correct?

19   A.    Yes.

20   Q.    Just briefly do you have other children in the Monticello

21   area?

22   A.    I have a daughter by the name of Michelle.

23   Q.    And she lives in the area as well; correct?

24   A.    Yes.

25   Q.    And I believe Michelle is a form of a substance abuse

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 55 of 107

1  counselor or educator; is that true?

2  A.   Yes.

3  Q.   All right.  So could I ask you just real briefly, sir, it's

4  my understanding that you own and operate a family business, a

5  dealership; is that right?

6  A.   Yes, for the last 48 1/2 years.

7  Q.   All right.  So -- and the name of the dealership is what,

8  please?

9  A.   Stephen Motors.

10  Q.   All right.  And it is located, the dealership, in

11  Monticello as well; correct?

12  A.   Yes.

13  Q.   Just briefly could I ask you then what contact has your son

14  Greg had with the employment or the dealership?

15  A.   He -- I had a son that was working for me and died in 2012,

16  and Greg came the next day and took over his position.

17  Q.   Sure.  And just briefly, the position that Greg has at the

18  dealership is what?

19  A.   He is general manager and really controller.

20  Q.   All right.  And the reality here of life today, there's a

21  possibility here that the dealership is probably going to have a

22  change or fluctuation in some management; is that right?

23  A.   Probably will.

24  Q.   All right.  And would it be fair to say that for the next

25  two, three months it would be critical for you and son to be

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 56 of 107

1  able to have some contact to effectuate that transition?  Is

2  that true?

3  A.   He is my right arm, so yes, definitely.

4  Q.   All right.  So if I could ask you just we could maybe

5  briefly educate our judge here about Greg's living situation.

6  It's my understanding Greg has a home virtually next door to the

7  dealership; is that right?

8  A.   It butts right up to the dealership.

9  Q.   All right.  And then your home where you and your wife live

10  is in what proximity to Greg's home?

11  A.   It butts up to the back of the dealership.

12  Q.   All right.  So you're all connected within feet of each

13  other; is that true?

14  A.   Yes.  And my daughter is also within a quarter of a block

15  from the dealership.

16  Q.   All right.  And, sir, if I could ask you -- we're not going

17  to get into case details here.  But would it be fair to say that

18  I believe some time early February you had some knowledge

19  that -- regarding your son, there were some search warrants

20  executed by law enforcement?

21  A.   Yes.

22  Q.   All right.  So here's my question.  So then I believe --

23  and this is just my estimate -- it was roughly about three weeks

24  later, give or take a day or two, that Greg was taken into

25  custody; is that right?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 57 of 107
*to purchase a complete copy of the transcript.*

1  A.   Yes, at the dealership.

2  Q.   All right.  So probably obvious to you, but just want to

3  reaffirm, during that three-week period, Greg stayed in the

4  community; is that right?  He was either at his home in Delhi or

5  in an area by you; is that right?

6  A.   Yes, definitely.

7  Q.   So just -- we've all used this term flight risk.  Greg

8  didn't leave, didn't take off, didn't do anything that you were

9  made aware of as far as leaving the area; true?

10  A.   No.  We not only work together at all times, but we're also

11  very close in the evenings also.

12  Q.   Sure.  And I guess that's the question.  I mean, it may

13  seem obvious, sir, to you, but I'd like to verify.  If there

14  were some terms, conditions that Greg were released by the

15  Court, would you cooperate with the probation/pretrial release

16  people to make sure that he follows rules and regulations or

17  whatever is asked of you?

18  A.   I would definitely do that.

19  Q.   Sure.  Your son but for these entanglements alleged has no

20  criminal history that you're aware of; is that right?

21  A.   None whatsoever.

22  Q.   All right.  So -- but let me ask you this.  Would you also

23  be, I guess, kind of a check or help monitor if needed or asked

24  by pretrial release Greg not have contact with minors?  Would

25  that be pretty easy to help?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 58 of 107
*to purchase a complete copy of the transcript.*

1    A.    It'd be very easy to do.

2    Q.    How about limitations, computers, cellphones, those kind of

3    things?  Would you agree to help monitor those?

4    A.    Yes, I definitely would.

5    Q.    All right.  And some of those issues did Greg impose on

6    himself after execution of these warrants, do you know, if you

7    know?

8    A.    No, I'm sure he didn't.

9    Q.    Okay.  So let's talk about just community ties then as far

10   as you're Greg's father, and obviously you said you have a close

11   relationship with him; true?

12   A.    Yes, that's very true.

13   Q.    All right.  There's really no need then for Greg to travel

14   extensively or travel at all.  Basically living in the home next

15   to the dealership, next to you and your wife, would that provide

16   appropriate contact for you to help the business transition and

17   assist with his pretrial release if granted?

18   A.    It would definitely work, and it's very much needed for

19   that matter.

20   Q.    And it's my understanding not only is your daughter, I

21   guess, a counselor, educated, Greg's mother is as well; is that

22   true?

23   A.    Yes, and she's also here in the courtroom.

24   Q.    Sure.  And she, I believe, has been snowbirding a bit down

25   south but will be home in April, is that right, back to Mont --

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 28   Filed 04/05/18   Page 59 of 107

1    A.   She's in the courtroom now, but she will be here 1st of

2    April.

3    Q.   Sure.  Sure.  And obviously is it your opinion that Greg's

4    mother would cooperate with any release conditions as well?

5    A.   Yes.  Both -- both of his mothers would also.

6    Q.   All right.

7    A.   My wife that I have now lives real close to him, and she

8    would very much oversee --

9    Q.   All right.

10   A.   -- and, in fact, feed him.

11   Q.   And not saying that, sir, this would happen, but if there

12   were some release conditions for Greg where he was on home

13   detention or had to wear a GPS monitoring device, you understand

14   home detention means home detention, and his liberty could be

15   restricted; right?

16   A.   Yep, I understand that.

17   Q.   All right.

18          MR. BROWN:  Roger, that's all I have, sir.  The

19   prosecutor may have a question here for you.

20          THE COURT:  Cross-examination, Mr. Morfitt?

21                       CROSS-EXAMINATION

22   BY MR. MORFITT:

23   Q.   Sir, how old are you?

24   A.   I'm 77.  Actually I'll be 78 in July.

25   Q.   How old is your wife?

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 60 of 107

1    A.    She's 74 -- 73.

2    Q.    Want to make sure we get that one right.  How about your

3    son Greg's mother?  How old is she?

4    A.    She's 75.

5    Q.    And, sir, in the -- do you know about how big a town

6    Monticello is?

7    A.    It's 3,800.

8    Q.    Does it have a high school?

9    A.    Huh?

10   Q.    Is there a high school in Monticello?

11   A.    Yes, there is.

12   Q.    And is the high school approximately -- and I'm guessing

13   here, so please correct me if I'm wrong, sir -- about half a

14   mile or three-quarters of a mile as the crow flies away from the

15   car dealership?

16   A.    If you'd have -- the way the bird flies would probably be

17   that.  It'd be a little more if you took the road.

18   Q.    About a mile if you have to go up and then over to get to

19   it?

20   A.    Yeah.

21   Q.    And near the dealership and the houses you've talked about,

22   is that where the Monticello Aquatic Center is located?

23   A.    The -- excuse me?  Ask me that again.

24   Q.    Sure.  They call it the aquatic center.  Less fancy people

25   like me might call it the pool.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 61 of 107

```
 1    A.    The school?
 2    Q.    Not necessarily the school, but is there a pool, an aquatic
 3    center?
 4    A.    There's a pool.  Yes, there is a pool.
 5    Q.    And that's kind of located across the street a little ways
 6    from the --
 7    A.    Yeah.
 8    Q.    And then there's Panther Park.  Are you familiar with that?
 9    A.    Yeah.  That's at a grade school.
10    Q.    Okay.  And that's about maybe a half a mile to the west of
11    the car dealership?
12    A.    Yep, I'm sure it is.
13    Q.    And also nearby the car dealership and your houses is the
14    track and field and football stadium for the high school?
15    A.    Yeah, that's right next to the swimming pool.
16    Q.    Sir, prior to the search warrants being done in this case
17    and what you've heard in court here today, were you aware that
18    your son, the defendant in this case, had a sexual interest in
19    minors?
20    A.    Absolutely not.
21    Q.    Had he ever asked or talked about, told you about his
22    interest in -- a sexual interest in minors?
23    A.    Absolutely not.
24    Q.    As far as you know, had he ever discussed that with anyone
25    in your family?
```

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR Document 24 Filed 04/05/18 Page 62 of 107

1  A.   Not to my knowledge.

2        MR. MORFITT:  Nothing further, Your Honor.

3        THE COURT:  Any redirect, Mr. Brown?

4        MR. BROWN:  Judge, thank you.

5                    REDIRECT EXAMINATION

6  BY MR. BROWN:

7  Q.   Sir, just real quick, so Mr. Morfitt gave you some

8  geography here about Monticello, about a park, a school, a pool,

9  those kind of things.  And I think the crutch here is that may

10 be where young adults or children may be; correct?

11 A.   Sure.

12 Q.   So are we clear, though, that if the judge released Greg

13 under certain conditions which we assume could include no

14 contact with minors you would help understand and enforce that;

15 is that true?

16 A.   I definitely would.

17 Q.   And if there was an issue with something like that, I'm

18 hoping you would alert me or pretrial release --

19 A.   You'd be the first one to contact.

20        MR. BROWN:  All right.  Thank you.

21        THE COURT:  Any redirect -- or recross on that,

22 Mr. Morfitt?

23        MR. MORFITT:  No, Your Honor.

24        THE COURT:  Okay.  Mr. Stephen, you can step down.

25 Thank you.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 63 of 107

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Does the defense have any other evidence

 3    it would like to offer?

 4              MR. BROWN:  We do not, Your Honor.  Thank you.

 5              THE COURT:  Okay.  And I guess for purposes of the

 6    record too, there is Defense Exhibit C that I believe was filed

 7    under seal.  And I assume, Mr. Morfitt, there was no objection

 8    to that exhibit?

 9              MR. MORFITT:  No, Your Honor.

10              THE COURT:  Okay.  Exhibit C is received under seal.

11                          *   *   *   *

12              (Exhibit C was admitted.)

13                          *   *   *   *

14              THE COURT:  Mr. Morfitt, does the government have any

15    evidence it would like to offer?

16              MR. MORFITT:  Yes, Your Honor.  The government plans

17    to call two witnesses.  The government would first call

18    Probation Officer Brian Draves.

19              THE COURT:  Okay.  And I do note, too, we've been

20    going about an hour and a half here.  I'm going to check with

21    the court reporter and everybody else.  Does anybody at this

22    point need a short break?  Mr. Morfitt?

23              MR. MORFITT:  The government is ready to proceed, Your

24    Honor.

25              THE COURT:  Mr. Brown, Mr. Meyer?
```

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 64 of 107

```
 1              MR. MEYER:  Your Honor, this is taking a little longer

 2   than I expected, so I need to make a phone call about an

 3   appointment I have at 3:30 which I'm probably not going to make.

 4              THE COURT:  Okay.

 5              MR. MEYER:  So if I could just have a moment to make a

 6   call to alert my client.

 7              THE COURT:  Sure.  How about we go ahead and take a --

 8   let's take a 15-minute break.  It's just about 2:30 now, so

 9   let's come back at 2:45.  We'll be in recess until that time.

10              (Recess at 2:32 p.m.)

11              THE COURT:  Thank you.  Please be seated.

12              Mr. Morfitt, you were getting ready to call your first

13   witness, Brian Draves.

14              MR. MORFITT:  Yes, Your Honor.  The government calls

15   Brian Draves.

16              THE COURT:  Mr. Draves, if you want to raise your

17   right hand.

18              BRIAN DRAVES, PLAINTIFF'S WITNESS, SWORN

19              THE COURT:  I don't think your microphone's on.  Okay.

20   Thank you.

21                       DIRECT EXAMINATION

22   BY MR. MORFITT:

23   Q.   Sir, can you please state your name.

24   A.   Brian Draves.

25   Q.   How are you currently employed?
```

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 65 of 107

1  A.   Employed as a senior U.S. probation officer for the

2  Northern District of Iowa.

3  Q.   And are you the author of the pretrial services report in

4  this case?

5  A.   Yes.

6  Q.   Have you also had an opportunity to see what's been

7  admitted as Defense Exhibit C?

8  A.   Yes.

9  Q.   And is that a federal pretrial risk assessment instrument?

10  A.   Yes.

11  Q.   Now, is this an instrument that you in executing your

12  duties as a probation officer use in pretrial cases?

13  A.   It is.

14  Q.   The version that is filed as Defense Exhibit C is version

15  2.0 and dated March 1, 2010.  Is that the most up-to-date

16  version of this instrument?

17  A.   No, it's not the most up-to-date version.

18  Q.   What is the most up-to-date version if you know?

19  A.   I don't know the exact number on there, but there is a

20  newer version of that.

21  Q.   Okay.  And then I believe did you fill out one of these or

22  a newer version of this instrument as part of your analysis in

23  this case?

24  A.   I did.

25  Q.   Now, Defense Exhibit C scores the defendant with a, I

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/19  Page 66 of 107

1   think, final score of 2 or total score of 2 on page 3.  Was your

2   total score 2, or was it different?

3   A.   My total score was a 3.

4   Q.   And why did you have a 3 rather than a 2?

5   A.   Well, the information that I had is that the defendant had

6   not completed a -- his education, a four-year degree, and thus

7   that would result in a different score.

8   Q.   So he'd get a point basically for the highest education

9   block.

10  A.   Well, you would get a point for the least education.  You

11  would get a zero mark for the most education.

12  Q.   Sure.  And that was a bad question.  On page 2 of Exhibit

13  C, 2.1 refers to highest education, and then it has zero for

14  someone who has a college degree; is that correct?

15  A.   Correct.

16  Q.   And one point for high school degree, vocational, or some

17  college.

18  A.   That's correct.

19  Q.   And you would have scored him with one point for some

20  college.

21  A.   That's correct.

22  Q.   What is this instrument used for?  How do you use it in

23  your work?

24  A.   It's used to get some case planning to determine exactly

25  where he falls in his -- as far as risk of flight or

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 67 of 107

1  dangerousness and can sometimes be used to assist the Court.

2  Q.   But correct me if I'm wrong, but bottom line is there's no

3  hard and fast if you score this amount probation's going to

4  recommend detention.

5  A.   Correct.

6  Q.   And similarly, there's no hard and fast if your score is

7  only 1 or 2, probation would recommend release.

8  A.   That is correct.

9         MR. MORFITT:  Nothing further, Your Honor.

10        THE COURT:  Cross-examination?

11                    CROSS-EXAMINATION

12  BY MR. MEYER:

13  Q.   Mr. Draves, it's my understanding -- and I'm sure you'll

14  correct me if I'm wrong -- but that this pretrial risk

15  assessment instrument was prepared or one of the purposes for it

16  was to try to predict the likelihood of success on pretrial

17  release?  Is that correct?

18  A.   It can be used for that, yes.

19  Q.   And I take it that in this district it's not used for that

20  or it is?

21  A.   There isn't a requirement for us to use it at that, but it

22  is used as a tool so that -- to assist us in making decisions.

23  Q.   And whether the score is a 2 or a 3, would that be

24  considered indicative of a low risk of failure on pretrial

25  release?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 68 of 107

1  A.   Yes, it would still be indicative of a lower risk.

2  Q.   All right.

3        MR. MEYER:  That's all the questions I have, Your

4  Honor.

5        THE COURT:  Any redirect, Mr. Morfitt?

6        MR. MORFITT:  No, Your Honor.

7        THE COURT:  Thank you, Mr. Draves.

8        Mr. Morfitt, you can call your next witness.

9        MR. MORFITT:  The United States calls Ryan Kedley.

10        THE COURT:  Mr. Kedley, if you want to raise your

11  right hand.

12          RYAN KEDLEY, PLAINTIFF'S WITNESS, SWORN

13        THE COURT:  Thank you.

14                    DIRECT EXAMINATION

15  BY MR. MORFITT:

16  Q.   Sir, can you please state your name.

17  A.   My name is Ryan Kedley, K-e-d-l-e-y.

18  Q.   How are you employed?

19  A.   I am employed with the Iowa Department of Public Safety's

20  Division of Criminal Investigation as a special agent.

21  Q.   And how long have you been a special agent for DCI?

22  A.   I was certified on October 19 of 2007.

23  Q.   Do you have any law enforcement experience prior to working

24  for DCI?

25  A.   No, I don't.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 69 of 107

1  Q.   What is your educational background?

2  A.   I was a 2005 graduate of the University of Northern Iowa

3  where I was -- received a bachelor of arts degree in

4  criminology.

5  Q.   And what training did you receive to become a DCI special

6  agent?

7  A.   I was enrolled in the 33rd Iowa Department of Public

8  Safety's basic academy in the spring of 2007 which is a 20-week

9  paramilitary academy held at Camp Dodge outside of Des Moines.

10  At the conclusion of that academy, upon receiving my

11  certification, was placed out in the field as a special agent

12  with the DCI.

13  Q.   And have you received ongoing continuing education,

14  training, and the like over the last decade or so?

15  A.   Yes, absolutely.

16  Q.   And are you the DCI agent, case agent, assigned to the

17  investigation involving the defendant in this case?

18  A.   Yes, I am.

19  Q.   And did you, in fact, sign the affidavit that was filed in

20  support of the complaint in this case?

21  A.   Yes, I did.

22  Q.   And is everything to your knowledge in that complaint

23  affidavit true and accurate?

24  A.   Yes.

25           MR. MORFITT:  Your Honor, the government would ask the

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR  Document 21  Filed 04/05/18  Page 70 of 107

1    Court to take notice of and consider the complaint affidavit

2    filed in this case.

3           THE COURT:  And the Court notes that was filed at

4    document number 2.  The Court will take notice of that.

5    BY MR. MORFITT:

6    Q.   Sir, how did you first -- or let me ask this.  How did law

7    enforcement first learn that there might be something worth

8    investigating about the defendant?

9    A.   Sure.  On I believe it was the Sunday prior to me becoming

10   actively involved in the case in mid February, I believe it

11   was -- you can help me out with the date.  I believe it was

12   February --

13   Q.   February 18?

14   A.   February 18, yes.  An individual had come forward to the

15   Monticello Police Department and indicated he had information

16   revolving out of a possible criminal act.  And out of that

17   conversation the chief of police of the Monticello Police

18   Department had reached out to Special Agent in Charge Richard

19   Rahn who is my immediate supervisor and requested Agent Rahn to

20   provide DCI assistance to a potential investigation involving

21   possession of potential child pornography.

22          Upon learning about this, Special Agent in Charge Rahn

23   had reached out to me ultimately and assigned me as the

24   investigations case agent and moved forward from there.

25   Q.   And, specifically, when this individual came forward to the

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 71 of 107

1   Monticello police chief, was that because he had found what he

2   discovered was a USB electronic charging device that was

3   actually a recording device?

4   A.   That's correct, yes.

5   Q.   And he'd found this inside the defendant's home?

6   A.   Yes, that's correct.

7   Q.   And which home was that?  Monticello or Delhi?

8   A.   That was the residence in Monticello.

9   Q.   And specifically this individual had found it plugged in in

10  a bathroom in the residence.

11  A.   I believe it was found in the bathroom, maybe on the

12  counter of the bathroom.

13  Q.   Not necessarily plugged in.

14  A.   That's correct, yes.

15  Q.   And can you just briefly describe what the device looked

16  like and what it is?

17  A.   Sure.  I describe it myself as a

18  one-inch-by-one-inch-by-one-inch cube, black in color, with

19  prongs which you can plug into an outlet on one side.  On that

20  same side is a sticker which reads 32 GB or commonly known as 32

21  gigabyte.  On the face of the device is what could be used as a

22  receiver for a USB cord, and then above that is a tiny pin-sized

23  hole which ultimately serves as a video recording outlook.

24  Q.   And it would be accurate to say that the only way to see

25  what has been recorded on this device would be to plug it into a

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 72 of 107

1   computer.

2   A.   That's correct, yes.

3   Q.   So it doesn't have any like playback features on the device

4   itself.

5   A.   That's correct, no playback features or a mini SD card

6   which is openly available to someone on the outside.

7   Q.   And this individual who came forward, he indicated that he

8   had found this in the defendant's home on the Thursday.  That

9   would be February 15?

10  A.   That's correct, yes.

11  Q.   And then did he say that later on February 16, so Friday,

12  the next day, that he'd gone back to the defendant's home and

13  discovered that one of the players from the Iowa Barnstormers

14  had spent the night?

15  A.   That's correct, yes.

16  Q.   So an Iowa Barnstormers player had spent the night

17  Thursday, February 15, into Friday, February 16, the morning.

18  A.   That's my recollection, yes.

19  Q.   Did this individual who took the device from -- or I should

20  ask this.  The individual actually ended up taking the USB

21  device from the defendant's bathroom.

22  A.   Yes, he did.

23  Q.   Did he actually plug it into a computer himself to view

24  what was on it?

25  A.   That's what was reported to law enforcement by this

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 73 of 107

1    individual, yes.

2    Q.    And he ultimately reported it to law enforcement because he

3    viewed what he believed to be underaged males in the nude on it.

4    A.    That's correct, yes.

5    Q.    And specifically video recordings?

6    A.    Yes.

7    Q.    And did this individual also indicate that the Barnstormers

8    player that he saw at the defendant's residence on February 16

9    was also one of the individuals who was recorded on the USB

10   recording device?

11   A.    That's correct, yes.

12   Q.    Now, at some point did the defendant call up a second

13   individual here and ask about the USB device?

14   A.    Yes, he did.

15   Q.    And that individual told the witness who came forward that

16   during that call the defendant seemed frantic about the device.

17   A.    Correct, yes.

18   Q.    Let's talk briefly about the Barnstormers.  What is the

19   Iowa Barnstormers?

20   A.    The Iowa Barnstormers to my knowledge is an AAU basketball

21   organization, amateur athletic union basketball organization,

22   which organizes teams ranging approximately from 5th grade in

23   age to the summer between a player's 11th grade and 12th grade

24   age, organizes these players, creates teams, travels throughout

25   the country, participated in tournaments under the team name of

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 26   Filed 04/05/18   Page 74 of 107

1  the Iowa Barnstormers.  Within the Iowa Barnstormers past and

2  present, you have hundreds of high school basketball players

3  occupying those teams from its duration back in the early to mid

4  2000s up until the current day.

5  Q.   And the defendant in this case was involved in the Iowa

6  Barnstormers from the time it first became an organization.

7  A.   It had first become an organization under the leadership of

8  an individual named Jamie Johnson.  Prior to his involvement

9  with the Iowa Barnstormers, it's my understanding that the

10  defendant also was a director of an Iowa Mavericks -- Iowa

11  Mavericks basketball organization.  At some point in the early

12  to mid 2000s, the two organizations merged, and the defendant

13  became a director of the Barnstormers hence forward.

14  Q.   And he remained involved with the Barnstormers until some

15  time in February of this year.

16  A.   That's correct, yes.

17  Q.   And in his role with the Barnstormers, did the defendant

18  have contacts with males under the age of 18?

19  A.   Yes.

20  Q.   How extensive a contact based on your investigation?

21  A.   Based on my investigation, almost constant communication

22  with various players from the organization.  The defendant would

23  travel with these players, like I said, ranging from

24  approximately fifth grade until later in high school, traveling

25  with these players throughout the country, staying in hotel

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 75 of 107

1 rooms, sharing hotel rooms themselves, oftentimes sharing beds

2 as well, and then communicating with players about team plans,

3 schedules, and practices when they're not actually out on the

4 road participating in tournaments and Barnstormer-related

5 events.

6 Q.   And how, based upon your investigation, did you discover he

7 would be in communication with these minors, the players?

8 A.   Via a Twitter account associated with the Iowa

9 Barnstormers, via Facebook pages, via his own cellphone through

10 text messages and calls, via Snapchat which is an app where you

11 can communicate, share pictures and videos, all of those types

12 of electronic -- and then also in person.

13 Q.   Now, once you became involved in the investigation, did you

14 ultimately conduct an interview with the defendant?

15 A.   I did, yes.

16 Q.   And do you recall what day that was?

17 A.   That was Thursday, February 22 of this year.

18 Q.   And was that, at least the initial interview, done at his

19 place of employment in Monticello?

20 A.   Yes, it was.

21 Q.   During that interview, did he acknowledge that he knew he

22 had this USB recording device?

23 A.   Yes, he did.

24 Q.   And did he tell you approximately for how long he had had

25 it?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 76 of 107

1  A.    He'd indicated for approximately two to three years.

2  Q.    And did he also acknowledge that there is some nudity

3  captured on video he made on that device?

4  A.    He did acknowledge that, yes.

5  Q.    Now, when you initially reviewed videos from that device --

6  and I just want to talk about your early review -- did you first

7  notice videos related to three players?

8  A.    Yes, I did.

9  Q.    And would it be accurate to say that the age of those

10 players were 12, 13, and 14?

11 A.    Yes, that would be accurate.

12 Q.    And you've confirmed as part of your investigation that

13 each of those individuals was a member of the Barnstormers?

14 A.    Yes, I have.

15 Q.    Now, of those three individuals, how many of those were

16 shown in videos where you could see their genitals?

17 A.    Two of the three.

18 Q.    What age were those two?

19 A.    13 and 14 years of age.

20 Q.    And the 12-year-old was also captured in videos, but he was

21 clothed?

22 A.    That's correct.

23 Q.    Now, is -- this 12-year-old, is that the same player that

24 had slept over at the defendant's house on Thursday, February

25 15?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 77 of 107

1    A.    That's correct, yes.

2    Q.    And during your interview with the defendant, did you talk

3    to him about the videos of these three players?

4    A.    Yes, I did.

5    Q.    Did he first indicate that he thought those videos had been

6    made at a hotel room in Ankeny, Iowa?

7    A.    That was his first understanding of it, yes.

8    Q.    Later on in the interview, did he change his mind about

9    where they'd been made?

10   A.    Yes, he did.

11   Q.    And where did he say they'd been made?

12   A.    At an Embassy Suites hotel located in Lombard, Illinois,

13   just outside of Chicago.

14   Q.    And they were made while he was on a trip to Chicago with

15   these three Barnstormer players?

16   A.    With those three Barnstormer players in addition to what

17   was later determined additional players.

18   Q.    And they were on their way there to see a Chicago Bulls

19   basketball game or something along those lines?

20   A.    Yes.

21   Q.    In reviewing the recordings, where did it appear it had

22   been plugged in in the hotel room at the Embassy Suites?

23   A.    In the hotel room bathroom.

24   Q.    And how was it situated?  What could you see on the camera

25   just of the bathroom?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 78 of 107

1    A.    Sure.  From the outlook of the camera itself, it appears it

2    was placed, if you're facing a bathroom mirror, just to the

3    immediate left of it.  As you're looking at it, you're looking

4    over the bathroom sink counter.  The toilet is in front of you.

5    Then to the right of the viewing area is the shower.

6    Q.    Would it be fair to say it appeared to be -- the video

7    appeared to be in such a way that if somebody came into the

8    bathroom to disrobe to take a shower it likely would have been

9    captured on the video?

10   A.    Yes.

11   Q.    And is that, in fact, what it appears to you to be for the

12   two boys that you can see nude on these videos that they

13   appeared to be getting ready to take a shower?

14   A.    Yes.

15   Q.    And just to be clear, on these video of these two boys, can

16   you see their genitals?

17   A.    Yes.

18   Q.    Did it appear from your review of the video that the two

19   boys who were captured nude were aware they were being recorded?

20   A.    It did not appear they were aware they were being recorded.

21   Q.    And why do you say that?

22   A.    No motion made by them indicates that they were ever

23   looking at the camera or performing for the camera.  In

24   subsequent interviews conducted with the parents of these

25   individuals, information has been relayed to me through the

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 79 of 107

1  parents indicating they had no idea they were being recorded.

2  Q.   And when you -- after you were done talking with the

3  defendant about these -- the recordings of these three boys in

4  Illinois, did he indicate to you that there were no other

5  occurrences of him ever taking secret video recordings of

6  players?

7  A.   Yes, that's correct.

8  Q.   Did that turn out to be an inaccurate statement on his

9  part?

10  A.   Yes, it did.

11  Q.   In a subsequent review of the same recording device, did

12  you find video recordings of a fourth player?

13  A.   Yes, I did.

14  Q.   And was he also captured in videos that showed him nude?

15  A.   Yes.

16  Q.   Including being able to see his genitals?

17  A.   Yes.

18  Q.   Has subsequent investigation determined where that video of

19  that boy was made?

20  A.   Yes.

21  Q.   Where?

22  A.   Ankeny, Iowa.

23  Q.   And specifically at -- I believe it's a Courtyard?

24  A.   Yes, Courtyard Marriott hotel.

25  Q.   The trip to Chicago, did that occur sometime in January of

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2-1   Filed 04/05/18   Page 80 of 107

1  this year?

2  A.   Yes, that's correct.

3  Q.   What about the trip to Ankeny as best you can tell from the

4  investigation?

5  A.   Based on the investigation, multiple trips were made by

6  Greg Stephen to the Courtyard Marriott hotel in Ankeny in 2008

7  alone.  Specifically there was two trips, one on the first

8  weekend of February and one on the second weekend of February

9  based on hotel registry information.  Also in analyzing the

10  video itself and with speaking with the parents who ultimately

11  confirmed their child was, in fact, the child depicted on the

12  video, it appears that video was most likely taken on the --

13  either the Friday night of February 9 or the Saturday morning of

14  February 10 at a room within the Courtyard Marriott in Ankeny.

15  Q.   And just to be clear -- I may have misheard you -- this

16  happened -- the Ankeny trips happened in 2018, not 2008;

17  correct?

18  A.   Yes, 2018.  I'm sorry.

19  Q.   And were you able to verify the age of the boy who was

20  depicted in the video from Ankeny?

21  A.   Yes, I was.

22  Q.   How old was he?

23  A.   13 years of age.

24  Q.   And I want to back up to something I forgot.  This

25  individual who came forward and brought the recording device to

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 81 of 107

1    the Monticello PD, did he indicate that he had previously found

2    what he thought were some pictures of naked boys in a room

3    belonging to the defendant?

4    A.    Yes, he did.

5    Q.    Specifically about 20 years ago he found something?

6    A.    Right.  He estimated about 20 years ago in the approximate

7    age range of when the defendant was either in high school or in

8    college.

9    Q.    And he said they looked like the pictures were homemade and

10    possibly found online and printed off the computer?

11    A.    That's correct, yes.

12    Q.    And he thought they depicted underaged males.

13    A.    Yes.

14    Q.    Now, as part of your interview with the defendant, did you

15    talk to him about why he made these videos?

16    A.    Yes, I did.

17    Q.    And is one thing he told you that he wanted to observe the

18    boys' development?

19    A.    That's correct, yes.

20    Q.    And specifically he wanted to observe the development of

21    their genitalia?

22    A.    Specifically, yes.

23    Q.    Later on during the interview did he also then indicate

24    that there was a sexual curiosity on his part as to why he was

25    creating these videos?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR    Document 2    Filed 04/05/18    Page 82 of 107

1   A.   Yes, he did.

2   Q.   And did he state that when he looked at these videos, when

3   he viewed these videos, he was maybe a little bit aroused?

4   A.   That's correct, yes.

5   Q.   Specifically he was aroused in the same way you would be

6   aroused when you view anyone naked?

7   A.   Correct.

8   Q.   Now, during your interview with him, did you at any point

9   ask him if he'd ever made any sexual advances towards one of his

10  players or former players?

11  A.   Yes, I did.

12  Q.   And he denied doing so?

13  A.   Yes, he did.

14  Q.   Did you ask him if he'd ever touched any of his players or

15  former players in a sexual manner?

16  A.   Yes, I did.

17  Q.   And he denied doing so?

18  A.   Yes, he did.

19  Q.   Did you ask him about whether -- in addition to the one

20  device that was found and seized that you had prior to the

21  interview whether he had any other additional covert or hidden

22  video cameras?

23  A.   Yes, I did.

24  Q.   Specifically whether he had any at his house.

25  A.   Either residence, yes.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2-1   Filed 04/05/18   Page 83 of 107

1  Q.   And either residence being Monticello and Delhi.

2  A.   That's correct, yes.

3  Q.   And what did he say about whether he had other video

4  cameras?

5  A.   He indicated no other devices would be found because he was

6  in possession of no other covert recording devices.

7  Q.   And that also was an inaccurate statement?

8  A.   Yes, it was.

9  Q.   As part of your investigation, did you, pursuant to search

10 warrants, search both the defendant's Monticello home and the

11 Delhi home?

12 A.   Yes, I did.

13 Q.   And during the search of the Monticello residence, would it

14 be accurate for me to say that you found four additional covert

15 USB recording devices?

16 A.   Yes, that is accurate.

17 Q.   Three of which were similar to the one that had already

18 been found in that they were the USB plug-ins?

19 A.   That is correct.

20 Q.   What did the fourth one look like?

21 A.   The fourth one appeared to me as if it was a plastic

22 mountable towel hook such as one that you would mount just

23 outside of a bathroom shower to hang your towel within arm's

24 reach.  Upon closer look of this mountable plastic hanging

25 device, it's equipped with, again, a pinhole-sized outlook as

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 84 of 107

1    well as a SD storage device card.

2    Q.    And two of these USB-type cameras, those were found in a

3    nightstand drawer in what appeared to be the master bedroom?

4    A.    Yes, that's correct.

5    Q.    And then the other covert USB recording device was found in

6    a backpack on a -- next to a desk in an office.

7    A.    That's correct, yes.

8    Q.    And was -- the hook device, was that also found in that

9    same backpack?

10   A.    Yes, that's correct.

11   Q.    What about during the search of the Delhi home?  Were any

12   what appeared to be covert cameras found during that search?

13   A.    Yes, there was.

14   Q.    Can you describe that for the judge, please.

15   A.    Yes.  One in particular was found in the Delhi residence's

16   bathroom.  And it was located -- this particular device was

17   located within the face of a smoke detector.  The smoke

18   detector's face was lying on the bathroom sink counter.  Within

19   the face of this smoke detector was what appeared to be a covert

20   video recording device which was plugged in and apparently being

21   charged.  The base of this particular smoke detector was located

22   within the bathroom directly above the bathroom toilet, and

23   nothing inside the face or within the base of the smoke detector

24   appeared to have any technology related to being a smoke

25   detector itself.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 85 of 107

1 Q. It appears to have just been purely a camera.

2 A. Absolutely.

3 Q. Designed to look like a smoke detector.

4 A. Correct, yes.

5 Q. And if -- the actual recording portion of it, the camera

6 that was on the counter, if it had been applied to the base on

7 the ceiling, would it be fair to say the camera would have been

8 facing directly down on to the bathroom toilet?

9 A. It's my understanding, yes.

10 Q. Now, these other devices -- I believe we've talked about

11 five other covert devices plus the one initial one -- are all

12 six of those devices undergoing further forensic analysis?

13 A. Yes, they are.

14 Q. And the results of that analysis are pending?

15 A. That's correct, yes.

16 Q. So at this point you don't know as you sit here today if

17 any other recordings have been found on those devices.

18 A. That's correct, yes.

19 Q. In addition to the covert recording devices, during these

20 searches, did you or other law enforcement officers seize

21 numerous computers and electronic devices?

22 A. Yes, we did.

23 Q. Including like storage devices, SD cards, and the like?

24 A. Yes.

25 Q. And a lot of cameras -- or not cameras, excuse me, phones?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 86 of 107

1  A.    Yes, phones, laptops, a hard drive, external hard drives,

2  et cetera, yes.

3  Q.    And those are all also still being analyzed.

4  A.    Yes, that's correct.

5  Q.    So at this point you don't know if there's any videos

6  homemade or other like downloaded child pornography that could

7  be located on those.

8  A.    That's correct, yes.

9  Q.    Now, during the course of your investigation, did you look

10 into whether any players of the Iowa Barnstormers would ever

11 stay overnight or visit the defendant at either of his

12 residences?

13 A.    Yes, I did.

14 Q.    What did you learn?

15 A.    Learned that it was not at all uncommon and fairly frequent

16 that the defendant would host get-togethers at his residence in

17 Delhi for the purpose of barbecues, boating events, and

18 sometimes sleepovers.  Some of those sleepovers happened in a

19 day leading up to a Barnstormer tournament.  So oftentimes

20 parents who couldn't transport their kids to the tournament

21 themselves would make arrangements for their child to stay with

22 the defendant at his residence in Delhi overnight and then

23 travel to the tournament or the event the next day.

24 Q.    And the 12-year-old that stayed overnight on Thursday,

25 February 15, did you learn that his parents had left him with

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 87 of 107

1  the defendant because the parents were going on vacation for the

2  weekend?

3  A.   That is correct, yes.

4  Q.   Now, during the course of your investigation as kind of

5  summarized in paragraph 43 of the affidavit, did you speak with

6  a witness who discussed a situation that had occurred in the

7  summer of 2016 in Las Vegas?

8  A.   I did.

9  Q.   And specifically this was a Iowa Barnstormers player?

10 A.   That is correct, yes.

11 Q.   Who was on a trip to Las Vegas with the defendant and other

12 players?

13 A.   That is correct.

14 Q.   And did -- this player who's referred to as witness 1 in

15 the complaint affidavit, did witness 1 indicate he shared a bed

16 in a hotel room with the defendant on this trip?

17 A.   Yes, he did.

18 Q.   What did he say happened one night while he was sharing the

19 bed?

20 A.   He indicated that one night while sharing the bed with the

21 defendant he awoke some time in the middle of the night.  He was

22 positioned at that point with his body facing the opposite

23 direction of where the defendant was lying and indicated he had

24 woken up to the repeated movement of the comforter and sheets

25 which were over him and also the sound of somewhat heavy

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 88 of 107

1   breathing coming from the defendant.  It was the witness's

2   understanding that what was going on behind him was the

3   defendant was masturbating.  And because of numerous reasons,

4   the witness indicated he basically froze and did not move until

5   much later during which time the movement of the sheets and the

6   comforter had stopped.  The witness reported soon thereafter the

7   defendant -- well, I'm sorry.  The witness reported that soon

8   thereafter the movement had stopped he had observed the sound of

9   multiple facial tissues being removed from a tissue box and then

10  no further sound after that.

11  Q.   You've kind of already touched on this, but the bed that

12  this witness 1 was sharing, the only other person in the bed

13  with him was the defendant.

14  A.   That's correct, yes.

15  Q.   Were there two other people, two other players, in the

16  room, however?

17  A.   Yes, there was.

18  Q.   Where were they sleeping?

19  A.   On the floor.

20  Q.   And how old was witness 1 at the time this happened?

21  A.   I believe he was 13 years of age at the time.

22  Q.   During the course of your investigation, have you

23  discovered any other witnesses that describe events similar to

24  that described by witness 1?

25  A.   Yes, I have.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 89 of 107

1    Q.   Let's start with any -- excuse me.  Let's start first with

2    somebody -- did you discover a witness who talked about an

3    incident occurring back in the mid 2000s?

4    A.   Yes, I did.

5    Q.   And was he a Barnstormer player at the time?

6    A.   Yes, he was.

7    Q.   Do you know -- did this witness indicate about how old he

8    was when this incident we're about to discuss happened?

9    A.   I believe it was right around the age of 15.  Not

10   specifically sure of that, but I believe it was age 15.

11   Q.   Definitely under the age of 18.

12   A.   Definitely.

13   Q.   What did this witness describe happening?

14   A.   This witness described sharing a bed with the defendant at

15   a hotel while on an Iowa Barnstormers trip.  He described waking

16   up in the middle of the night to the feeling of the defendant

17   touching this witness's buttocks, and it was the witness's

18   understanding that with the other hand the defendant was

19   masturbating.  Once again, this happened several years ago, but

20   the witness was very distinct in his recollection of what had

21   occurred while sharing the bed with the defendant.

22   Q.   And did the witness then describe what he did when he woke

23   up feeling the defendant's hand on his buttocks while the

24   defendant was masturbating?

25   A.   He describes trying to get out of the bed, then ultimately

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 90 of 107

1    was directed back into the bed by the defendant.

2    Q.   And did he -- the witness say that he then got back into

3    the bed?

4    A.   Yes.

5    Q.   And what happened when he returned to the bed?

6    A.   Ultimately a hand was placed back on the witness's

7    buttocks.

8    Q.   And moving forward in time, is there -- did you discover

9    another witness during your investigation who described an

10   incident similar?

11   A.   Yes, I did.

12   Q.   When approximately did that happen?

13   A.   Around the same time.

14   Q.   Around the same time as the witness we just talked about?

15   A.   Right.  In the mid 2000s, yes.

16   Q.   And what did this next witness describe happening?

17   A.   This witness also described an instance where he was on a

18   Iowa Barnstormers-related trip staying at a hotel room.  In this

19   hotel room he was sharing with the defendant and ultimately

20   sharing a bed with the defendant, he recalled waking up at some

21   point to the feeling of the defendant's hands placed on this

22   witness's buttocks.

23   Q.   Any other witnesses that you've determined at this point

24   that described similar incidents?

25   A.   We have one additional witness at this point who describes

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 91 of 107

1  a similar instance but can't say -- because he felt he was

2  sleeping at the time, can't say with a hundred percent certainty

3  that he was subjected to any sort of touching but does indicate

4  that a similar occurrence was subjected to him.

5  Q.   Can you describe more what he says just to make it clear?

6  A.   Sure.  He indicates that once again some time in the middle

7  of high school before he was the age of 18 he was on an

8  out-of-state trip.  This one was on the west coast.  He was

9  sharing a hotel room with the defendant and one of his Iowa

10 Barnstormer teammates.

11           On this specific trip he was sharing a bed with the

12 defendant while his roommate was sleeping on a pullout couch.

13 He indicates that prior to sharing a hotel room with the

14 defendant he had actually been informed by a teammate to beware

15 of sharing hotel beds with the defendant.

16           Once arriving at the hotel and coming into the

17 knowledge that he was going to be sharing a bed with the

18 defendant, he became somewhat wary but ultimately shared a bed

19 regardless.

20           He indicates that sometime in the middle of the night

21 he awoke to what he thought was someone touching him and

22 ultimately, as he put it, somewhat freaked out and from that

23 point forward would not share a bed with the defendant.

24           Upon further questioning of the witness, he indicated

25 he could not with 100 percent certainty say that without a

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 92 of 107

1    shadow of a doubt that he had been touched by the defendant in

2    the buttocks but indicated he had a better than 50/50

3    understanding that he thought that he had.

4    Q.   And would it be fair to say that as part of your

5    investigation so far you've only spoken to a very small

6    percentage of the players who played for the Iowa Barnstormers

7    over the last 10 to 15 years?

8    A.   Very small, yes.

9    Q.   Now, as part of the investigation in this case, did a law

10   enforcement officer speak to the parents of one of the children

11   who was depicted on the video seen in the first recording, those

12   first three files we talked about?

13   A.   Yes.

14   Q.   And did that parent indicate to the law enforcement officer

15   that the defendant had been in contact in some way with the boy

16   who was in these videos after the search warrants had been

17   executed?

18   A.   Yes.

19   Q.   How did the parent indicate the defendant had been trying

20   to reach his or her son?

21   A.   Through the cellular phone application Snapchat.

22           MR. MORFITT:  Nothing further, Your Honor.

23           THE COURT:  Cross-examination, Mr. Meyer, Mr. Brown?

24                        CROSS-EXAMINATION

25   BY MR. MEYER:

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 1:18-mj-00074-LRR   Document 2   Filed 04/05/18   Page 93 of 107

1   Q.   Good afternoon, agent.  So correct me if I'm wrong, but my

2   understanding from listening to you is you basically related

3   what was in your complaint, right, went over it and testified

4   about that; correct?

5   A.   Yes, that's correct.

6   Q.   And then things that weren't in the complaint were these

7   last -- your final testimony about speaking with former

8   Barnstormer players in the mid 2000s; is that correct?

9   A.   Yes, that's correct.

10  Q.   So that could be somewhere between 2000 and 2010 -- is that

11  what you meant -- or more recent than that?

12  A.   I would say in the mid 2000s, ranging anywhere between 2003

13  to two thousand -- to the late 2000s, yes.

14  Q.   Okay.  And I'm assuming that this -- these allegations were

15  not reported to law enforcement at any point prior to when you

16  talked to them?

17  A.   That's correct.  They were not reported to the law

18  enforcement prior to this.

19  Q.   All right.  And so obviously then no charges were filed;

20  right?

21  A.   Not to my knowledge, no.

22  Q.   And there's been no conviction for any conduct related to

23  these -- what you were told.

24  A.   That's correct, yes.

25  Q.   So when was it that you personally interviewed Mr. Stephen?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 94 of 107

1    A.    Thursday, February 22 of this year.

2    Q.    And at that point you talked to him about possible criminal

3    conduct?

4    A.    Yes, I did.

5    Q.    And did -- how many conversations did you have with him?

6    Just one?

7    A.    On that specific day.

8    Q.    Okay.

9    A.    I and my partner had had an initial conversation with him

10   at his place of employment.  After that was concluded, my

11   partner and I had left the place of employment returning within

12   the next couple hours to have a brief subsequent conversation

13   with him.

14   Q.    And did this conversation with Mr. Stephen occur before or

15   after the search of his residence?

16   A.    The initial conversation with the defendant began prior to

17   the start of the execution of the search warrant.  The execution

18   of the two search warrants from that day began while we were in

19   the midst of the interview of the defendant.

20   Q.    So when that day concluded, he was aware that he'd been

21   interviewed by a couple DCI agents and there'd been a search of

22   the residence in Monticello or Delhi or both?

23   A.    Both.

24   Q.    Both, all right.  So he knew all these things; right?

25   A.    Yes.  He was provided copies of search warrants that

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 95 of 107

1  specific day.

2  Q.   And to your knowledge he stayed in the vicinity of his home

3  or his employment thereafter until he was arrested?

4  A.   To my knowledge, yes.

5          MR. MEYER:  Nothing further, Your Honor.

6          THE COURT:  Any redirect, Mr. Morfitt?

7          MR. MORFITT:  No, Your Honor.

8          THE COURT:  Thank you.  You can step down, agent.

9          Mr. Morfitt, do you have any other evidence you'd wish

10  to offer?

11          MR. MORFITT:  No, Your Honor.  The government rests.

12          THE COURT:  And I guess, Mr. Morfitt, if there were

13  any identified victims, were they provided notice, and do any of

14  them wish to be heard?

15          MR. MORFITT:  Yes, Your Honor.  They were provided

16  notice of this hearing, and to my knowledge no victims are here

17  or wish to make a statement.

18          THE COURT:  Okay.  Well, the purpose of the hearing

19  here today is obviously to determine whether -- first of all,

20  the defendant is presumed to be innocent of this charge, and

21  nothing that occurs or that I say or any findings I make is

22  meant to imply otherwise.  It's just the purpose of the hearing

23  is to determine, despite that presumption, whether the defendant

24  should be released or has to be detained pending trial or

25  pending further proceedings in this case.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 96 of 107

1       The Court is cognizant of the fact that detention is

2   an exceptional step.  It is presumed that a defendant would

3   be -- who has been charged with a crime should be released

4   without any conditions and that conditions should only be

5   imposed if they are necessary and the least restrictive

6   conditions should be imposed if required and only as a last

7   resort should a person be ordered to be detained pending further

8   criminal proceedings.

9       The government has requested detention here, and so

10  the Court must determine whether the defendant poses a risk of

11  flight and/or a danger to the community.  There is a rebuttable

12  presumption in this case the defendant does pose both of those

13  risks and should be detained because this is an offense, a

14  specific offense, named by statute that involves at least one

15  minor victim.

16      Based upon the evidence presented here, I do find that

17  the defendant has presented sufficient evidence to rebut that

18  presumption, and so then I need to make further findings to

19  determine whether or not the government has met its burdens of

20  showing that there are no condition or combination of conditions

21  that would assure the defendant's appearance as well as the

22  safety of the community.

23      In making my findings, I consider, of course, the

24  factors provided for by statute.  I first consider the nature

25  and circumstances of the alleged offense.  The offense charged

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 97 of 107

1   is transportation of child pornography and, based upon this

2   record, appears to stem from covert recordings that were made

3   allegedly by the defendant of minor victims who were unaware

4   they were being recorded in a bathroom.

5           On the one hand, it would seem that it perhaps is

6   questionable whether or not recording a person disrobing while

7   clearly probably illegal in some respects, whether that

8   qualifies as child pornography for federal statute purposes.

9   But I think that based upon the evidence here before the Court

10  today that would clearly make that conclusion that the defendant

11  allegedly took these videos for the purpose of sexual

12  gratification and arousal.

13          The nature and circumstances of the offense are

14  incredibly troubling because this was done in a covert manner.

15  And it appears to have been done and facilitated through the

16  defendant's use of his position as a coach and managerial member

17  of a youth sports team.  The testimony is that parents entrusted

18  their minor children to the defendant's care for overnight stays

19  and for otherwise and that it was perhaps during -- the evidence

20  is that during trips that's when videos were allegedly made.  So

21  the nature and circumstances of the alleged offense weigh

22  strongly in favor of detention.

23          The next factor the Court considers is the weight of

24  the evidence.  The weight here seems to be fairly strong, and so

25  it generally weighs in favor of detention, although that is

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 98 of 107

1  perhaps the least important factor the Court considers in making

2  its decision.

3          I also consider the history and characteristics of the

4  defendant.  The defendant's father testified.  I found him to be

5  a very credible witness, and obviously from that testimony --

6  and I guess one question I did forget to ask you, Mr. Stephen, I

7  understand your father is there.  I've gotten to see him by

8  video.  I understand your mother is there, but I forgot to ask

9  you, could you please let me know what other family members or

10  friends do you have in the courtroom?

11          THE DEFENDANT:  My father's wife -- my father's wife

12  Sandy, so my stepmother, my mother, and my father are all here.

13          THE COURT:  Okay.  Thank you.  And it's nice to see

14  that you have people in the back of the courtroom.  A lot of

15  people don't.

16          But clearly from the information from the defendant's

17  father as well as the pretrial services report, the defendant

18  has strong family ties, strong family support, and obviously is

19  a longtime member of the Monticello community and surrounding

20  area.

21          He has a strong work background.  He has been employed

22  it appears most of his adult life.  He doesn't appear to have

23  any type of mental health issues or substance abuse issues at

24  all that would cause the Court concern and appears to be in good

25  physical health.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/19   Page 99 of 107

1      He has literally no criminal history. From what I can

2 tell from the pretrial services report, he does not even have a

3 speeding ticket which, quite frankly, Mr. Stephen, that's -- I

4 don't know if I've really ever seen that. Maybe one other case

5 where somebody has nothing, not even including a speeding

6 ticket. So those factors all weigh strongly in favor of

7 release.

8      The last factor that I consider under the statute is

9 the nature and seriousness of the danger of others to the

10 community. Based upon the testimony of witnesses that there

11 appears to have been some type of touching allegedly by the

12 defendant of minor boys that appears to be tied to sexual

13 arousal and gratification with the defendant masturbating while

14 touching the buttocks area of minor boys or just masturbating in

15 the bed, that greatly increases, I think, the risk and

16 seriousness of the danger to the community that the defendant

17 may pose. Videotaping minor people in a bathroom for the

18 purpose, you know, and trying to capture their genitalia is very

19 concerning. But the fact that there is evidence here that

20 allegedly there was hands-on contact causes great concern that

21 perhaps there is an interest in minor children in a sexual

22 nature but that that interest is being acted upon both by making

23 the videos but also perhaps by touching minor children.

24      And again, I put this in context of it's alleged that

25 this appears to have been done through the use of the position

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 100 of 107

1    of trust as a coach or as a mentor and a leader of the youth

2    basketball organization to which these parents had their

3    children playing basketball and entrusted the defendant with

4    their care.  So that favor -- or that factor also weighs in

5    favor of detention.

6            I have considered the recommendation by the pretrial

7    services office.  Quite frankly, this is a recommendation, it

8    surprised me when I first looked at the report because, again,

9    everything else in the report indicates the defendant doesn't

10   pose a risk of flight or a danger to the community because he

11   has strong family ties, strong work background, strong ties to

12   the community, no criminal history, no issues with substance

13   abuse, and those types of issues.  But that recommendation is

14   made solely based upon the nature of the offense.

15           So I give that recommendation some consideration,

16   although perhaps not as much as I sometimes would because it --

17   most of the information in the report that probation had weighs

18   in favor -- pretty much all of the other information in the

19   report that probation has weighs in favor of release.

20           This is a difficult case, and after considering all of

21   the evidence, I do find that the government has not met its

22   burden with regard to risk of flight.  The government has to

23   show by preponderance of the evidence that there are no

24   condition or combinations of conditions that would assure the

25   defendant's appearance.  I think that I could impose conditions

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/03/18   Page 101 of 107

1  such as electronic monitoring and other things.  And, quite

2  frankly, I don't find the defendant poses much of a risk of

3  flight, if any, because of his strong ties to the community.  He

4  was aware of potential charges after the search warrant was

5  executed but yet remained in the community, didn't try to flee.

6  So I don't think the government's met its burden in that regard.

7  That's a fairly easy call in my opinion.

8           It's more difficult with regard to the danger to the

9  community.  Again, as I indicated, the -- at first blush, the

10  nature of the videos, the whole situation's just not good.

11  There's no good reason to try to be taking these type of videos

12  or doing any of this.  There's just no other way to say it.  But

13  in the whole spectrum of the world of child pornography, very

14  sadly, there are many, many worse types of videos that are

15  produced and that are possessed.  So that I think mitigates

16  against a danger posed by the defendant.

17           Based upon the testimony here today, though, that

18  there does appear to have been hands-on touching -- and again,

19  in the whole scheme of different types of sexual abuse that can

20  occur, touching of buttocks while masturbating sadly is on the

21  low end of the spectrum.  It's still -- considering all of the

22  factors together, I do find the government has met its burden by

23  clear and convincing evidence that there are no condition or

24  combination of conditions that will assure the safety of the

25  community.  And because of that, I will order that the defendant

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR  Document 24  Filed 04/05/18  Page 102 of 107

1    be detained pending further proceedings in this case.

2           Mr. Stephen, you do have the right to appeal my

3    decision.  You can make that appeal to a district court judge,

4    and they would consider your appeal.  Any appeal you make just

5    needs to be made within 14 days.  That's something you can

6    discuss further with your attorneys.  But you do absolutely have

7    the right to appeal my decision.

8           Is there anything else we need to address in this

9    matter, Mr. Morfitt?

10           MR. MORFITT:  No, Your Honor.

11           THE COURT:  Mr. Meyer?  Mr. Brown?

12           MR. MEYER:  Your Honor, I don't think I'll probably

13    change your mind, but I would refer the Court -- I'm sure you've

14    probably considered this already, but Judge Pratt in a case

15    United States versus L-e-y-b-a found that allegations of

16    misconduct not resulting in an arrest are insufficient to base a

17    finding of danger to the community.

18           And I think the Court, you know, considered a lot of

19    factors.  But what seemed to tilt the balance was these

20    allegations of conduct in the mid 2000s which haven't even

21    resulted in a -- any sort of -- haven't even resulted in a

22    charge let alone a conviction.  So relying on, you know, the

23    finding in the Leyba case, I would ask the Court to reconsider.

24           THE COURT:  Okay.  And, Mr. Morfitt, do you have any

25    response to that?

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 1:18-mj-00074-LRR Document 24 Filed 04/05/18 Page 103 of 107

1       MR. MORFITT:  Your Honor, the Court has heard the

2  evidence.  It's not simply charges that we're asking the Court

3  to consider but evidence from a witness relayed to law

4  enforcement.  And we do believe that is sufficient cause to

5  allow the Court to conclude by clear and convincing evidence

6  that this defendant is a danger.

7       THE COURT:  Okay.  No, and I will consider this as an

8  oral motion to reconsider.  I did review the brief that was

9  submitted by the defense prior to the hearing as part of their

10  motion.  And it gave a very nice overview and outline of the

11  Bail Reform Act and of the applicable laws and considerations

12  the court makes in making these decisions.

13       And I did take into account I -- all of this.  Again,

14  the defendant's presumed innocent of what he's actually charged

15  with.  Obviously we don't even have to have a presumption of

16  innocence for things he's not charged with.  So I do take that

17  into consideration.

18       Again, I think it's a difficult decision in this case,

19  one that I have struggled with.  And I do understand the

20  defense's position.  And, you know, with great respect to Judge

21  Pratt and his opinion, I understand that the allegations from

22  the testimony have not been charged.  They have not been proved.

23       But I am just tasked with making findings based upon

24  the evidence presented and the factors provided for in the

25  statute that I've outlined to make a decision as to whether or

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 1:18-mj-00074-LRR  Document 24  Filed 06/05/18  Page 104 of 107

 1  not the government has met its burden and whether there are

 2  conditions that would assure the safety of the community as

 3  that's what I have found the defendant should be detained based

 4  upon.

 5        I do reconsider, and I do take all of that into

 6  account.  I think that I am allowed to consider that type of

 7  testimony obviously giving it its due weight or perhaps lack

 8  thereof because it isn't a conviction.  It's not even charged

 9  conduct.  But that being said, I think it very much goes to the

10  nature and circumstances of the offense and the seriousness of

11  the danger posed.

12        So for that -- that reason I don't -- it doesn't

13  change my decision.  And I did.  I considered all of the

14  available conditions of release.  The defendant recommended or

15  his release plan would be to reside at his residence in Delhi,

16  and I understand as an alternative he can reside at the

17  residence -- his residence in Monticello.  I considered him

18  living perhaps with parents or family members as third-party

19  custodians.  I also considered him residing at a residential

20  reentry center or a halfway house-type setting.

21        And I've considered all of the other limitations and

22  restrictions of curfew, residence.  I've considered electronic

23  monitoring which I think in this type of case actually would

24  somewhat help alleviate or avoid perhaps contact with minors.

25  But really that mainly addresses, too, a risk of flight which I

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:18-mj-00074-LRR   Document 24   Filed 04/05/18   Page 105 of 107
*to purchase a complete copy of the transcript*

 1   don't think the defendant poses, at least not to the extent that

 2   couldn't be alleviated by conditions of release.

 3          And again, as I noted, the defendant literally has no

 4   criminal history, not even a speeding ticket.  And so I've taken

 5   all that into consideration and weighed it.  And again, I think

 6   it's a close decision, and it's a tough case.  But having

 7   considered that and reconsidered it, my decision remains the

 8   same.  If there's an appeal made, I could be wrong.  That's

 9   obviously -- I've called it as best I can based upon the facts

10   and evidence I have and the statute and factors I am allowed to

11   consider.  And so with that, that is my decision.

12          Anything else we need to address, Mr. Brown,

13   Mr. Meyer?

14          MR. MEYER:  No, Your Honor.

15          MR. BROWN:  No, Your Honor.  Thank you.

16          THE COURT:  Mr. Morfitt?

17          MR. MORFITT:  No, Your Honor.

18          THE COURT:  Okay.  Thank you.  That will conclude the

19   hearing.

20          (The foregoing hearing was concluded at 3:41 p.m.)

21
                            CERTIFICATE
22          I certify that the foregoing is a correct transcript
     to the best of my ability over the VTC from the record of
23   proceedings in the above-entitled matter.

24
         S/Shelly Semmler                   3-31-18
25        Shelly Semmler, RMR, CRR              Date

Case 1:18-mj-00074-LRR   Document 24   Filed 04/03/18   Page 106 of 107

**<u>INDEX</u>**

**<u>WITNESS</u>:**                                                                  **<u>PAGE</u>:**

  LUIS ROSELL
                    MR. MEYER                                        4
                    MR. MORFITT                                      9
                    MR. MORFITT                                     26
                    MR. MEYER                                       51

  ROGER STEPHEN
                    MR. BROWN                                       54
                    MR. MORFITT                                     60
                    MR. BROWN                                       63

  BRIAN DRAVES
                    MR. MORFITT                                     65
                    MR. MEYER                                       68

  RYAN KEDLEY
                    MR. MORFITT                                     69
                    MR. MEYER                                       93

* * * * *

**<u>EXHIBITS</u>:**

  A and B                                                           50
  C                                                                 64

* * * * *